**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
|    v. | |
| **NICHOLAS DECARLO,** <br> also known as "Dick Lambaste," <br> also known as "Dick NeCarlo," | **Case No. 21-cr-73-1 (BAH)** |
| and | |
| **NICHOLAS R. OCHS,** | |
|    **Defendants.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM FOR NICHOLAS DECARLO

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Nicholas DeCarlo to a sentence of 48 months' incarceration (within the 41-51 month Guidelines range), three years of supervised release, $2,000 in restitution, a fine, and the mandatory $100 special assessment.

## I.    INTRODUCTION

Nicholas DeCarlo participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more

than one hundred law enforcement officers, and resulted in more than $2.8 million in losses.[1]

DeCarlo continues to earn his livelihood from "Murder the Media" – the media platform whose name he scrawled on the Chestnut-Gibson Memorial Door of the U.S. Capitol. He is also a manager at IHOP.

DeCarlo raised money to fund his trip to D.C., promising to teach "leftists" a "lesson they would never forget." On January 6, DeCarlo and Ochs marched to the Capitol, with DeCarlo filming (to create content for Murder the Media). He was wisecracking and giddy as he made his way into the restricted area. At the Capitol, any pretense that he was some sort of journalistic observer quickly dissipated: with Ochs joining in, he threw a smoke bomb at the police, lit cigarettes in the Crypt, yelled "Where's Nancy?" and pointed rioters toward Speaker Pelosi's office. He stole flex cuffs and, as noted above, defaced a door with his company's sinister name, "Murder the Media." He laughed, joked, and flashed the thumbs-up sign at various points throughout his romp.

These were no teenage pranks. DeCarlo's conduct targeted the police and Members of Congress – and like the conduct of every rioter that day, threatened democracy itself. By attempting to inject humor and a carnival atmosphere into the breach (a breach that had staffers hiding under desks and officers fearing for their lives), DeCarlo created an environment that downplayed the threat, normalized violence, and encouraged the rampant lawlessness that unfolded at the Capitol. He did so in concert with his codefendant, Nicholas Ochs, an Elder (a

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ 2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

senior leadership role) in the Proud Boys; DeCarlo had significant ties to the Proud Boys as well.

The government recommends that the Court sentence DeCarlo to 48 months' incarceration, within the advisory Guidelines' range of 41-51 months, which the parties have agreed is the correct Guidelines calculation. A 48-month sentence reflects the gravity of DeCarlo's conduct, which included acts of violence and property damage – to say nothing of the psychological scars of the many victims of the riot and damage to the institution of democracy that the attack caused.

## II.      FACTUAL BACKGROUND

### A.      DeCarlo's Role in the January 6, 2021 Attack on the Capitol

As set out more fully in the statement of offense (ECF No. 79 at ¶¶ 8- 21) DeCarlo participated in the attack on the United States Capitol, an attack that disrupted the peaceful transfer of power after the November 3, 2020 presidential election and caused extensive damage and injury. In early January 2021, Ochs and DeCarlo, coordinated their travel to D.C. with assistance of another individual involved in their "Murder the Media" online outlet. They both created fundraisers on GiveSendGo to raise money to attend the rally.   DeCarlo raised $150. HIs fundraising appeal stated:

> Get Dick to DC to STOP THE STEAL TRUMP 2020.
> ***CALLING ALL PATRIOTS***
> The DemocRats are at it again! This time: **THEY'VE STOLEN A WHOLE ELECTION!** It's up to one man, with the help of Nick Ochs, to expose those "tolerant" leftists for their lies and teach them a lesson they'll **NEVER** forget:  The **MAGA TRAIN** will **KEEP ON ROLLIN'! TRUMP 2020 BABAAAY!**
>
> Dick NeCarlo is an honest and well-respected host of the (in)famous online talk show ThunderdomeTV and news correspondent for MTMedia News, the only honest media out there. It is **CRUCIAL** that Dick makes it out to DC to join his fellow patriots to help **STOP THE STEAL,** but he can't do it without your help! Let's get the Leftist's worst nightmare out to DC!

3

DeCarlo discussed some of his other preparations in messages sent using an encrypted application the evening of January 4. DeCarlo wrote to one contact, "Nick's got some magazines I'm gonna duct tape to myself, I'll probably grab some other stuff tomorrow too."[2] Referring to Ochs, he continued, "He's definitely gonna be more of a target than I am. I think I'll be alright." The contact advised DeCarlo, "But also stay with the boys. Safety in numbers." DeCarlo said, "I have a job to do," continuing, "I gotta stop this steal."

DeCarlo flew from Texas and met with Ochs in Virginia, where they shared a hotel room. That night, DeCarlo posted a 15 minute "selfie" video stream titled *BlackVill'd: Twas the Night Before Revolution!!!* to the Murder the Media/ThunderdomeTV Facebook page. DeCarlo said he spoke to "Enrique," "who isn't even allowed in D.C.," referring to Proud Boys leader Enrique Tarrio, who had been arrested the day before and ordered to stay out of Washington, D.C.[3] DeCarlo stated that they would be getting a "nice early interview" with Enrique the next day.  He also said that he had "a lot of shit planned for tomorrow."

### DeCarlo's Actions on January 6

The following morning, Ochs and DeCarlo drove to Washington, D.C. They began filming during their drive to the city and would frequently film themselves throughout the day.[4] They attempted to sound lighthearted and detached in their banter for the camera but did not always

---

[2]       \\usa.doj.gov\cloud\DC\PHB\US   Capitol   Riot   Breach   Investigations\Crim Division\Cases\2021R00402 Nicholas Ochs\Discovery\1-18-22 production\DeCarlo scoped cell phone\Phone Extraction data\Cell Phone

[3] Tarrio has since been charged with seditious conspiracy and other offenses in connection with his role in the January 6 attack at the Capitol. *United States v. Nordean,* No. 21-cr-175 (TJK).

[4] Ex. 1 to United States' Report Regarding Video Evidence Described in Statements of Offense, ECF No. 74 (hereinafter "Statement of Offense Video Ex.")

succeed. DeCarlo said, "we are here to stop the steal."[5] Ochs laughed, and said, "if we don't get there quick, they are going to steal it." DeCarlo said, "you and me Nicky, we're the only ones who can fuckin do it."[6] Ochs replied, "us and our million friends." Grimacing, Ochs said, "It'll be like 3 in the afternoon when Mike Pence fails?"[7] Soon after, DeCarlo asked Ochs, "Why are you being so hopeless?"[8] Ochs scoffed, "a positive attitude will fix it?"[9]

By approximately 12:45 p.m., Ochs and DeCarlo had joined the throng marching to the Capitol. They arrived at the West Front of the Capitol and passed into the restricted area.[10]

They narrated their approach for the camera, with Ochs saying, "the steal is in fact right here and we are going to stop it" and pointing toward the Capitol Building.[11] Below is a still frame from DeCarlo's video showing Ochs gesturing toward the Capitol.



DeCarlo said, "this is where they are going to steal it. And they called on us. They called on us to stop it. We are putting an end to it. They said calling all patriots. And our MVPs. Our MVP VIPs. Nick Ochs and Dick NeCarlo. Live on the scene. We're going to put the kibosh on

---

[5] *Id.* at 0:10.
[6] *Id.* at 0:15.
[7] *Id.* at 0:30.
[8] *Id.* at 1:13.
[9] *Id.* at 1:29.
[10] Statement of Offense Video Ex. 8 at 0:02.
[11] *Id.* at 0:33.

this."

As they approached the West Plaza, DeCarlo commented, "What a crowd," and Ochs said, "This is a thing."[12] As the crowd thickened, they paused near partially downed fencing. DeCarlo filmed himself laughing:[13]



An individual with a radio on his shoulder (later identified as Proud Boy James Elliott (the defendant in *U.S. v. Elliott,* 21-cr-735 (RCL)) raised his fist to the crowd and led chants of "Whose house?  Our house!"[14] All smiles, Ochs and DeCarlo began dancing and singing, "Our house – in the middle of our street," echoing the popular song, "Our House," released in 1982.[15]

Their gleeful reaction to the growing threat continued. Pointing his camera to the media tower, which rioters now stood atop, DeCarlo asked, "Should we try to climb that thing?"[16]  Ochs said, "we're not supposed to be here, this is, like, beyond the fence." Neither, however, saw this as much of a problem. DeCarlo responded, "Oh really?" and Ochs said, "Yeah dude." They

---

[12] *Id.* at 1:10.
[13] *Id.* at 1:57.
[14] *Id.* at 2:15.
[15] *Id.* at 2:24.
[16] *Id.* at 2:50.

laughed:



DeCarlo said, "we're all felons, yeah!" Ochs echoed: "Yeah!"  DeCarlo started chanting, "Felony charges! Felony charges!"[17]

Ochs admitted, "I'm liking this…feels kind of real."[18]  DeCarlo observed, "it's getting aggressive." The giddiness continued. Ochs joined chants of "Stop the Steal!"  DeCarlo said, "I'm working on it! . . . Guys, I'm trying."[19]  He then told a joke about how "you can't be the last one chanting."

DeCarlo and Ochs moved toward another set of fencing on the West Front. DeCarlo said, "you guys see this fence? Torn down!" as Ochs gestured toward it:[20]

---

[17] *Id.* at 3:05.
[18] *Id.* at 3:20.
[19] *Id.* at 4:00.
[20] *Id.* at 4:49.



   They then moved past the fence, not far from scaffolding in place for the inauguration. After rioters overwhelmed the small number of police officers guarding the scaffolding, Ochs and DeCarlo moved forward with the crowd underneath it.[21] The crowd pushed, and rioters began coughing from the effects of pepper spray.[22] Ochs filmed rioters passing a bicycle-rack barricade and using knives to cut through the fabric covering the scaffolding.[23] Flash bangs exploded just outside the scaffolding. [24] Ochs and DeCarlo met another Proud Boy and introduced themselves.[25]

   Perhaps because of the pepper spray (DeCarlo had donned a face mask by that point), they walked back out from under the scaffolding and returned to the West Plaza. By then, the conflict between rioters and police had intensified: Ochs filmed rioters spraying the police and metal rods flying through the air toward the police line. [26]

---

[21] Statement of Offense Video Ex. 10.

[22] *Id.* at 0:40-1:00.

[23] Statement of Offense Video Ex. 11

[24] *Id.* at 1:23

[25] *Id.* at 2:43

[26]  Statement of Offense Video Ex. 13 at 0:01.

v



Ochs and DeCarlo then joined the physical attacks on the embattled police officers. DeCarlo then threw a smoke grenade at the police, and exclaimed, "Oh fuck, I just threw it without pulling the pin. God damn it."[27]

Ochs threw a smoke bomb too. [28]  Neither Ochs nor DeCarlo filmed themselves throwing these objects – but they were captured by a third party, and Ochs' cell phone, pointed elsewhere, nonetheless captured the audio. Below is a still shot of DeCarlo, showing the smoke bomb flying toward the police line:

---

[27] Statement of Offense Video Ex. 12 at 1:10-1:20; Statement of Offense Video Ex.13 at 0:28.
[28] Statement of Offense Video Ex. 12 at 1:20-1:26.



Below is a close-up image of DeCarlo with his arm cocked, holding the smoke grenade:



Below is a still frame of Ochs throwing a smoke grenade, followed by another frame showing the object flying through the air toward the police line:





Ochs and DeCarlo moved farther away as they attempted to recover from the effects of OC spray (which Ochs referred to as "CS gas"). As they stood near a fence, Ochs said, "a little pepper spray never hurt nobody."[29] DeCarlo noted the "endless fucking crowd in several directions," calling it "fucking beautiful." Ochs said, "we're good. This happens sometimes...I just got CS gassed." Someone offered Ochs water; he said, "I'm used to it. I go to these things." DeCarlo added, "this ain't our first pepper spray."[30]

---

[29] Statement of Offense Video Ex. 13 at 1:47.
[30] *Id.* at 2:34.

DeCarlo and Ochs then returned to the scaffolding, which rioters had broken through, and climbed the stairs to the Upper West Terrace, approaching an entrance to the Capitol Building. On the staircase, DeCarlo turned toward the crowd behind him and yelled, "Let's go!"[31] Reaching the Upper West Terrace, they filmed the largecrowd gathered below. DeCarlo said, "you think they are scared in there?"[32] Ochs replied, "yeah, and I fucking love it!"

At approximately 2:23 p.m., Ochs and DeCarlo entered the Capitol through the Senate Wing Doors as alarms blared.



They turned right and walked down a hallway. They entered the Senate Spouses' Lounge. DeCarlo cackled, "isn't this nice. What a lovely room."[33] Ochs and DeCarlo took selfies seated at a conference room table.

---

[31] Statement of Offense Video Ex. 14 at 1:15.
[32] *Id.* at 3:02.
[33] Statement of Offense Video Ex. 18 at 1:20.

As they walked down a hallway and through an atrium,  Ochs yelled, "it's a beautiful tour of the Capitol. With  Murder the Media!" [34] They arrived at the Crypt of the Capitol at approximately 2:26 p.m., just after rioters had overwhelmed the police line there. Ochs and DeCarlo walked around, laughing and filming. They then decided to smoke cigarettes. DeCarlo said, "this is an occasion." [35] He said, "look at all the shit you can't do in here. This is our fucking building." [36] Ochs held up his cell phone, and DeCarlo commented, "Congress goes into lockdown." [37]  He then began to yell, "where's Nancy?  Where you at, Nancy?"  He yelled, "what else can we take?" and then joined chants of "Our house," no longer appending the song lyrics he had earlier. [38] They appeared to be enjoying the experience and saw their time in the Capitol as cause for celebration. They posed for pictures with their celebratory cigarettes. In the photograph below, posted by Ochs, DeCarlo is on the left, and Ochs is on the right.



---

[34] *Id.* at 2:54.
[35] *Id.* at 3:48.
[36] *Id.* at 3:48.
[37] *Id.* at 4:38.
[38] *Id.* at 4:50.

After the breach of the police line in the Crypt, a group of officers retreated toward the Capitol Visitors' Center. They attempted to close crash doors in a hallway off the Crypt to prevent the rioters from entering. The rioters jammed the crash doors, however, by sticking objects underneath them so that they could not close. As one individual stuck a flagpole underneath the door, wedging it open, DeCarlo and Ochs stood nearby, filming and laughing. [39] In the first still frame below, a red arrow points to the door that the rioters wedged open with the blue flag. The second is a still frame from DeCarlo's video showing the flag jamming the door; in the video, his cackle accompanies. [40]



---

[39] Statement of Offense Video Ex. 21 at 0:10.
[40] *Id.*



DeCarlo saw a staircase to the side and asked, "what's up there?" [41] Ochs said, "Looks valuable. I bet it's the fucking chamber, dude." They moved toward the stairs and climbed them.[42] Officers were visible at the top, however, and one began walking down the stairs toward them.[43] They walked back down the stairs to the hallway by the Crypt, DeCarlo yelling, "this is our house!"[44] Rioters at the bottom of the stairs asked them what was going on, and DeCarlo said that they were "a little outnumbered up there." [45]

Next, as someone nearby yelled "Advance! Advance!" Ochs and DeCarlo went downstairs to the Capitol Visitor's Center. [46] Ochs and DeCarlo witnessed another standoff between rioters and police, who were guarding tunnels that led to the House and Senate office buildings.

---

[41] Statement of Offense Video Ex. 20 at 0:29.
[42] Statement of Offense Video Ex. 21 at 0:26.
[43] *Id.* at 1:10.
[44] *Id.* at 1:20.
[45] *Id.* at 1:25.
[46] Statement of Offense Video Ex. 23 at 0:16.

16

Ochs and DeCarlo made their way back upstairs to the East Foyer, near the Rotunda Doors. Ochs filmed a blood-like smear of red liquid on the floor. [47]



There, they found Proud Boys Nordean (on the right) and Paul Rae (on the left) (a defendant in *United States v. Jackman*, 21-cr-378 (TJK)), who were in the area with a small group.[48]



---

[47] Statement of Offense Video Ex. 25 at 0:07.
[48] *Id.* Ex. 25 at 0:33.

After a group hug, DeCarlo continued to explore the East Foyer while Ochs, Nordean, and Rae made their way into the Rotunda. DeCarlo soon joined them there.

Ochs and DeCarlo milled around the Rotunda. At one point, they motioned toward an exit from the Rotunda that led toward Speaker Pelosi's office, yelling "Nancy's office!"[49]



A group of rioters soon gathered there, including Richard Barnett (the defendant in *United States v. Barnett,* 21-cr-38 (CRC), who was photographed that day with his feet on Speaker Pelosi's desk), who yelled at officers that he had left his flag behind in her office and wanted it back. Police, their backs to a stairway, tried to keep the rioters from advancing, but the rioters shoved forward, threatening to push the officers down the stairs before reinforcements arrived and the rioters were repelled.

---

[49] Statement of Offense Video Ex. 28 at 59:40-1:00:10.

Ochs and DeCarlo exited the Capitol at about 3:00 p.m. but did not leave the area. Instead, they walked around outside to the Chestnut-Gibson Memorial Door, where the Capitol Police had left a duffle bag. They rummaged through the bag. DeCarlo stole a pair of flex cuffs.



With a marker, DeCarlo also scrawled "Murder the Media" on the door as Ochs recorded him in the act.





They both then posed for photographs in front of the door. In the image below, Ochs is on the left and DeCarlo is on the right.



Ochs and DeCarlo also posed for a photograph with Jacob Chansley, the defendant in

*United States v. Chansley,* 21-cr-3 (RCL), also known as the "QAnon Shaman," which was posted

to Murder the Media's Parler page.



As they walked away from the Capitol that day, Ochs said, for the camera, "sorry we couldn't go live when we stormed the fuckin' U.S. Capitol and made Congress flee." [50] DeCarlo laughed and flashed a thumbs-up sign.

After they left the Capitol, Ochs and DeCarlo continued to film while still in Washington, D.C. In one video, Ochs stated, "Viewers, . . . we have some good news: . . . We have just, uh, peeked through this window, and on the television the headline reads that Congress stopped the vote when we stormed the Capitol. And, as we've been saying all day, we came here to stop the steal." [51] DeCarlo interjected "we did it," to which Ochs replied, "we were being sarcastic, but we didn't know we were actually going to . . . ." DeCarlo then asked, "Wait, you were being sarcastic?" Ochs answered, "I was being a bit facetious," to which DeCarlo replied, "Oh no, that's what I came down here to do. We fucking did it." Ochs then said words to the effect of, "It may resume, but the steal is for now stopped. You're welcome, America!" to which DeCarlo replied "we did our job. We did our job."

At 3:54 p.m., in an encrypted chat called "MTMclipz," involving seven individuals, DeCarlo wrote, "Yeah, me and Ochs stopped the steal. You're welcome, America." Just before 7 p.m. that night, in an encrypted chat among members of Murder the Media, however, Ochs wrote, "let's delete that picture of the MurderTheMedia written on the door. Just to be safe."

In the evening of January 6, 2021, ThunderDomeTV posted a video to YouTube titled "Talking to our Frens in DC," [52] an interview of DeCarlo by the individual at Murder the Media

---

[50] Statement of Offense Video Ex. 32.
[51] Statement of Offense Video Ex. 33.
[52] https://www.youtube.com/watch?v=4nNog08v8sU. ("*Talking to our Frens*")

who had helped coordinate his travel. In the interview, DeCarlo began by saying, "What's going on, America?  You're welcome, by the way."

When asked why DeCarlo had taken a picture with the individual later identified as Jacob Chansley (the "QAnon Shaman"), DeCarlo said that they had both done "some bad ass shit." DeCarlo's colleague congratulated him on "being part of one of the biggest historical events in American history" and asked DeCarlo, "how do you feel about that?"  DeCarlo said, "it felt great, and I did a lot of shit I shouldn't have…maybe I did, maybe I didn't."[53] He continued, "maybe I smoked some cigarettes, maybe I spat on a riot officer, maybe I didn't."[54] The interviewer echoed: "It was a peaceful protest. And every now and then, during peaceful protests, things happen. That doesn't mean you participated in it. You were media. Don't ever forget that…you were covering a very important historical event."[55] DeCarlo agreed, coughed, and said, "Yeah, I was covering a historical event. Not gonna lie, I wish I'd grabbed some souvenirs from there."[56] He mentioned, "someone got Pelosi's podium. That was pretty cool."[57] He and the interviewer then suggested that it was permissible to take government property because, as DeCarlo said, "Who owns the government?  That's us." DeCarlo continued, "that was our Capitol. That was the way we all saw it when we were inside."[58] He then tried to correct himself, saying, "or at least the people I was covering."[59]  He reinforced the point: "That's our building. And you can't kick us out of it." He

---

[53] *Talking to our Frens* at 2:45
[54] *Id.* at 3:04.
[55] *Id.* at 3:10.
[56] *Id.* at 3:30-3:38.
[57] *Id.* at3:45.
[58] *Id.* at4:05.
[59] *Id.* at 4:10. DeCarlo would later give an interview to the *Los Angeles Times* where he repeated the claim that he was merely an investigative reporter. Molly Hennesy-Fiske, "Some who stormed the Capitol insist, 'What I did was journalism,"  ·  https://www.latimes.com/world-

gloated, smiling broadly, "And they couldn't":



DeCarlo claimed that there were 1,000 attacks on rioters for every attack on the police.[60] He said that he had video of the police "just opening fire, throwing…flash bangs on us, macing us" (although he later clarified that he did not hear any gunfire).[61]  He chortled, "there might have been some retaliation here or there."[62]

DeCarlo next contrasted the rioters' efforts to protests by the "left."[63] "A ton of people congregated today and proved a really good point…by actually protesting and doing something that made a bold statement like this. We didn't light a garbage can on fire…we didn't smash any bank windows. We didn't tear down any innocent businesses. We stormed a building that belongs to us."[64] DeCarlo described his footage as "hilarious."[65] He noted that he "ran into some people too.  I won't say their names on here. It was good."[66] DeCarlo claimed that he and Ochs spent "an

---

nation/story/2021-01-13/some-who-stormed-the-capitol-insist-what-i-did-was-journalism,      Jan. 13, 2021
[60] *Talking to our Frens* at 4:55.
[61] *Id.* at 5:15; 8:35
[62] *Id.* at 5:25
[63] *Id.* at 5:50.
[64] *Id.* at 5:55-6:19.
[65] *Id.* at 7:30.
[66] *Id.* at 7:36.

hour and half, two hours" in the building and "got pretty far." [67]

DeCarlo relayed some of the events he had experienced, including seeing "a window get ripped off the Capitol and people climb into it,"[68] and items getting torn from the walls. He paused, laughed, and said, "I witnessed cops get overwhelmed a shitload."[69] Consistent with what Ochs had filmed, he confirmed that he had seen a few different puddles of blood.[70] He also said he had seen people "break into an office and got some shots in there that were pretty good. Maybe someone did some cocaine in there, maybe someone didn't."[71] He had the sense that "everyone in there was just looking for the fucking Senate Floor."[72]

DeCarlo next described the breach of the scaffolding. He said that the crowd realized that there were "only six" officers trying to stop them and pushed forward.[73] DeCarlo said he felt the crowd move and overwhelmed police; he climbed the scaffolding, "jumped in through a window, and smoked some cigarettes inside the Capitol Building.  That was cool."[74] The host noted that "American citizens outnumber police 1,000 to 1. And the idea that what happened today couldn't happen on any day of the week is nonsense." [75] He told his viewers, "you far outnumber the people on the left. They go out, but today, you saw what happens when you go out." [76] DeCarlo nodded.

The host next asked DeCarlo about "after parties."[77] DeCarlo said there would be a "huge"

---

[67] *Id.* at 20:46.
[68] *Id.* at 9:40.
[69] *Id.* at 10:00.
[70] *Id.* at 10:05.
[71] *Id.* at 21:05.
[72] *Id.* at 22:26.
[73] *Id.* at 11:38.
[74] *Id.* at 12:00.
[75] *Id.* at 14:29.
[76] *Id.* at 14:55.
[77] *Id.* at 15:05.

one. He noted, however, that there was a curfew, so he was going to have to take a "secret party Underground Railroad to get to where we need to be."[78] The host said, "revolution just happened. You gotta celebrate," and DeCarlo nodded.[79] The host asked DeCarlo if he could buy alcohol.[80] DeCarlo noted that all the stores were closed because of the curfew, but he had bought a bottle of champagne earlier.[81] The host asked DeCarlo if he regretted that purchase, and DeCarlo said that he regretted "that I didn't run back to the Capitol sooner with that champagne. We wanted to go back into the building and pop a cork."[82] He laughed. [83]

The host asked DeCarlo how Ochs was doing. DeCarlo said Ochs was "great. He's riding this high just like me."[84] The host said he was "all for" something like January 6 happening again.[85] The host then asked DeCarlo, "you went there for one sole purpose, and you accomplished that. Would you like to tell everybody what it was you accomplished?"[86] DeCarlo said, "I don't know if you guys got the memo…me and Nick Ochs went there specifically to stop the steal. It happened."[87]

After DeCarlo described the incident where a rioter jammed open a door with a "Back the Blue" flag, [88] the host asked him if there was anyone inside who appeared to be supporting the

---

[78] *Id.* at 15:23.
[79] *Id.* at 15:39.
[80] *Id.* at 15:40.
[81] *Id.* at 15:52.
[82] *Id.* at 15:55.
[83] *Id.* at 16:07.
[84] *Id.* at 16:15.
[85] *Id.* at 17:00.
[86] *Id.* at 17:12.
[87] *Id.* at 17:24.
[88] *Id.* at 18:45.

police.[89]   DeCarlo said, "absolutely not," and said that there were far more people shouting that the police were "traitors."[90] However, he said, no one inside the Capitol "got violent with the cops."[91]

At the conclusion of the interview, DeCarlo, in response to the question, "what is next for Murder The Media?" said, "I would like to say Congratulations to America and you're welcome. But uihhh what's next for Murder the Media. Yeah, I know, somebody like tagged something on the building… I saw a couple of tags [referring to the Murder the Media tag on the Capitol door]."[92] DeCarlo claimed that "we stumbled upon it [the tag]" and that he and Ochs had spent the day explaining the ethos of "murder the media" and then "to find that message had already spread so vastly that people were tagging it, I thought that was so cool."[93] DeCarlo and the host then discussed that the trip had been expensive for Murder the Media, but they hoped it would pay off.[94] Describing Murder the Media's content, the host says, "You need to wake up, America. You need to laugh a little bit at everything that's going on but, at the same time, still take it seriously."[95]

Asked for final comments, DeCarlo said: "authority is a lie. It's an illusion. Security, authority, the police. It's all a fucking lie. The only thing that stops us from doing what we want to    do    with    our    lives    is    believing    in    that    lie.... 'the police are on our side.'  No. They're not." [96]

---

[89] *Id.* at 19:20.
[90] *Id.* at 19:30.
[91] *Id.* at, 19:50.
[92] *Id.* at, 25:05.
[93] *Id.* at 25:30.
[94] *Id.* at 26:30.
[95] *Id.* at 27:25.
[96] *Id.* at 27:43.

The next day, January 7, Ochs flew back to Hawaii. He was arrested when he landed at the airport. On January 26, 2021, DeCarlo was arrested, and FBI agents searched his residence. They found a framed photograph of DeCarlo and Ochs flashing thumbs up next to their Murder the Media graffiti, along with a pair of flex cuffs that appeared consistent with the ones stolen from the mass arrest kit in front of the Memorial Door.





### *Fundraising*

DeCarlo launched a fundraiser for his defense on the website GoGetFunding. As of November 19, 2022, he had raised $7,096.[97] In a video on the website, a Murder the Media

---

[97] https://gogetfunding.com/nick-decarlo-defense-fund.

colleague urged followers to donate to DeCarlo through an encrypted site; thus, it is possible that he raised additional funds of which the government is not aware.

The fundraiser, entitled "Nick DeCarlo Defense Fund," claims, "Dick went with Nick Ochs to cover the events of 1-6-2021 and is being politically persecuted for doing his job: covering a historic event with his camera. The mainstream media, leftist Twitter mobs, Antifa, and the FBI are all trying to paint him as an insurrectionist and a terrorist for trying to show the world the truth of what was happening." [98]

In a video on the website, filmed January 20, 2021,[99] DeCarlo claimed that he was facing political persecution, being prosecuted for simply reporting on an historic event. He said that he and Ochs were "tasked with" doing "satirical reporting and field interviews at the event."[100] He explained that he and Ochs had decided to "document the march that commenced following Trump's speech." He claimed that he and Ochs had sought to film and document events at the Capitol throughout the day because they were confident that the "mainstream media" would "skew and exaggerate" them.[101]  He claimed that they sought to show "both sides" of what happened that day (the "protestors and the police"), and that "neither of us participated in any vandalization, we didn't open any doors, we didn't enter any private offices, and we were not given any instruction from law enforcement to leave."[102] He said he had been inside the building for 90 minutes. [103]

---

[98] https://gogetfunding.com/nick-decarlo-defense-fund.
[99]  https://gogetfunding.com/nick-decarlo-defense-fund, Nick D Defense Video, at 2:30 (mentioning that DeCarlo learned "yesterday, January 19" of a warrant for his arrest).
[100] *Id.* at 0:30.
[101] *Id.* at 1:10.
[102] *Id.* at 1:35.
[103] *Id.* at 2:05.

Describing Ochs' arrest, DeCarlo said that he was "kidnapped" by the FBI.[104] He claimed that the government was prosecuting "professionals for doing their jobs."[105] Following DeCarlo's fundraising appeal, the video continued with another Murder the Media commentator, who claimed that "we are seeing political witch hunts for…anything right of center." The commentator declared, "Freedom of speech is on the line. Freedom of press is literally dead."[106] He opined that there was "prosecution" for "simply being at rallies, being at protests."[107]

DeCarlo's counsel is court-appointed. His fundraiser stated that DeCarlo "will have to travel to DC to appear in court, along with getting court appropriate clothing, living with his current restrictions, etc. If anything is left over from this fundraiser, the remainder will go to a charity supporting similar causes." The upcoming sentencing hearing is the first hearing in this case that will require DeCarlo's travel to Washington.

### DeCarlo's Affiliation with the Proud Boys

DeCarlo has "Proud Boy" tattooed on his left arm. PSR ¶ 73. A tattoo is the "third degree" of initiation into the Proud Boys (first degree membership being the lowest, and fourth degree being the most senior). According to a 2018 version of the Proud Boys International Constitution and Bylaws, the third degree of membership, symbolized by the tattoo, is "meant to symbolize the commitment of truly being a brother for life." In 2017, DeCarlo appeared in an NBC News segment on the Proud Boys, dressed in the Proud Boys' signature black and yellow polo shirt and matching hat. "Far-Right Proud Boys Cultivate Male Angst," NBC Left Field, Nov. 2, 2017, *available at*

---

[104] *Id.* at 2:17.
[105] *Id.* at 2:47.
[106] *Id.* at 3:30.
[107] *Id.* at 3:45.

https://www.youtube.com/watch?v=nGZ-rw1Zgjw:



DeCarlo reported to Probation that he resigned from the Proud Boys in 2019. PSR ¶ 46.

As noted above, DeCarlo indicated in a video on January 5 that he had been in contact with Enrique Tarrio. Evidence recovered from DeCarlo's phone indicates that, on December 19, 2020, the same day that then-President Trump announced plans for a "wild" rally in Washington, D.C., DeCarlo called Gavin McInness, the founder of the Proud Boys. He also, of course, coordinated his actions on January 6 with Ochs and warmly greeted Proud Boys leader Ethan Nordean and another Proud Boy, Paul Rae, inside the Capitol.

Other evidence indicates that DeCarlo ran for election as an Elder, a senior leadership position within the Proud Boys, in August 2020 (after his reported resignation). In the Proud Boys' Official Presidents' Chat on an encrypted messaging application, the members were discussing who should be nominated as "Elders," and DeCarlo's name came up repeatedly. For example, one

user said, "If I get voted in again and Nick DeCarlo isn't voted in, I'll resign that day."  Another message indicated that DeCarlo was actively campaigning: "We need to have a campaign page where there's no chat, just posts from guys running . . . Some guys would make funny meme add campaign clips like DeCarlo did . . . or you could actually post what your ideas are for the direction you're looking to take the club.")

## III.     INDICTMENT AND PLEA AGREEMENTS

On February 4, 2021, a federal grand jury returned an indictment charging Ochs and DeCarlo with Conspiracy, in violation of 18 U.S.C. § 371, Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2) and (2), and five misdemeanors, including Destruction of Government Property, in violation of 18 U.S.C. §§ 1361 and 2, for defacing the Memorial Door, and Theft of Government Property, in violation of 18 U.S.C. § 641 and 2, for stealing the flex cuffs. ECF No. 17. On February 18, 2022, the grand jury returned a superseding indictment, which removed one of the misdemeanor charges. ECF No. 68. On September 9, both defendants pled guilty to Count Two, Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), pursuant to plea agreements. Sept. 9, 2022 Minute Entry.

## IV.     STATUTORY PENALTIES

As noted by the plea agreement and the U.S. Probation Office, DeCarlo faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Two, Obstruction of an Official Proceeding.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

Probation's Guidelines calculation is the same as the parties' calculation in the plea agreement. That Guidelines analysis follows:

Count Two: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property[108] | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[109] +3 | |
| | **Total** | **25** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **22** |

*See* Plea Agreement ¶ 5(A).

---

[108] U.S.S.G. § 2J1.2(b)(1)(B) applies because the defendant's offense involved "threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." As two examples, DeCarlo threw smoke grenades at the police and defaced the Memorial Door.

[109] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. DeCarlo admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement officials from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

The U.S. Probation Office calculated DeCarlo' criminal history as category I, which the government does not dispute. PSR ¶ 61. He has one criminal history point, from a 2018 conviction for marijuana possession. *Id.* ¶ 60. Accordingly, based on the calculation of DeCarlo's total adjusted offense level, after acceptance of responsibility, at 22, his Guidelines imprisonment range is 41 to 51 months' imprisonment.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

Under 18 U.S.C. § 3553(a), the factors this Court must consider when imposing a sentence include the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

DeCarlo's role in the January 6 attack merits a significant term of incarceration. He threw a smoke grenade at the police (specifically, at a police line dangerously outnumbered by a mob), defaced the Memorial Door with "Murder the Media," stole police flex cuffs, directed rioters toward Speaker Pelosi's office (after earlier calling, "Where's Nancy?"), smoked cigarettes in the Crypt to celebrate the evacuation of Congress, and enjoyed a fellow rioter's effort to jam open crash doors, filming throughout. Out of all this aggravating conduct, throwing a smoke grenade at the police line was notably particularly dangerous behavior. The police were substantially outnumbered and were trying to defend against threats from right in front of them and threats from

34

those, like Ochs and DeCarlo, whom they could not see.

This conduct is all in addition to the act of breaching the Capitol, serious itself. Within minutes of entering the restricted area, he and Ochs recognized that they were not supposed to be where he was. He knew what the fences meant. His reaction? To gleefully chant, "Felony charges!" Throughout, he thoroughly enjoyed the riot and others' similar acts, seeing it as not only a successful obstruction of the certification vote. He also saw it as an opportunity to thrill and entertain his followers.

But it was nothing of the sort. It was a grave attack on the peaceful transfer of power that also carried a human cost. When Ochs and DeCarlo motioned rioters toward "Nancy's office," there were staffers hiding in fear under their desks.[110]

Even DeCarlo did not see the event simply as bread and circus. He and Ochs were gleeful when they reported to viewers that "Congress stopped the vote." DeCarlo repeatedly said, "you're welcome, America." And, of course, he has now admitted that he intended to stop the certification. DeCarlo's post-riot interview on Murder the Media left no doubt that he was pleased about what had happened, and not just because he found it entertaining. His final observations were that "security, authority, the police" were all a "lie." He was not joking. One cannot watch DeCarlo's actions that day and his discussion of them afterwards and conclude that he was merely reporting what he had seen or trying to use humor to condemn what had happened. As DeCarlo's *Murder the Media* interviewer explained, even if he sought to "laugh a little bit at everything that's going

---

[110] *Pelosi says staff hid under a table for hours as rioters vandalized her office,* The Washington Post, available at https://www.washingtonpost.com/nation/2021/01/11/pelosi-60-minutes-capitol-impeachment/ (Jan. 11, 2021).

on," he also did "at the same time, still take it seriously."[111]

DeCarlo's guilt, of course, does not depend on whether he obstructed the certification to entertain or because he wanted Donald Trump to retain power. In any event, the evidence here suggests dual aims. And both are worthy of punishment. Joining a dangerous mob and engaging in and celebrating violence and property damage, all for laughs, indicates an alarming lack of judgment. So does a willingness to turn to such behavior to attain one's political goals.

A word about "Murder the Media," the name of Ochs' and DeCarlo's online platform. Scrawled on a door to the Capitol, it was both a crude advertisement and a chilling message. The name of their platform is no accident; DeCarlo expressed disdain for the mainstream media.

In his interview the night of January 6 (and in his fundraising appeal), DeCarlo denied responsibility for the graffiti but also noted with satisfaction the attention it received. That attention was not limited to fellow rioters. Combined with the attacks that occurred on members of the media and their equipment that day, DeCarlo's graffiti made many journalists feel less secure going about their daily work. *See, e.g.,* "Covering Pro-Trump Mobs, the News Media Became a Target," *The New York Times,* https://www.nytimes.com/2021/01/06/business/media/media-murder-capitol-building.html (Jan. 6, 2021); Laurel Bowman, "January 6 Riot Changes Conversation About Media Safety in US," *Voice of America,* https://www.voanews.com/a/january-6-riot-changes-conversation-about-media-safety-in-us/6385881.html (Jan. 6, 2022).

In addition, by trying to create a carnival-like atmosphere inside the Capitol at times, by acting like directing others to the Speaker's office or jamming open crash doors off the Crypt was a joke, Ochs and DeCarlo normalized the rioters' behavior. They made it seem like it was all in

---

[111] *Talking to our Frens* 27:25.

good fun, rather than the worst attack on the Capitol since the War of 1812. And they very well may have emboldened those around them, by playing the role of an appreciative audience and by acting like the breach was an opportunity for hijinks and laughs. In summary, DeCarlo's activities at the Capitol, which included property damage and conduct that threatened to cause injury, his desire to broadcast his behavior and celebrate the same, and his efforts to make light of the events, all demonstrate the seriousness of the offense.

### B.  The History and Characteristics of the Defendant

DeCarlo is in Criminal History Category I. He has one previous conviction that resulted in a two-day sentence. He has ties to the Proud Boys going back to 2017; on January 6, he moved in concert with Ochs, a Proud Boys Elder; he had been in contact with Tarrio the day before and embraced Nordean and Paul Rae when he saw them inside the Capitol.

While he has now accepted responsibility by pleading guilty, DeCarlo's earlier public statements about the riot were the opposite: devoid of remorse and, at times, dishonest. His interview with Murder the Media the evening of January 6 depicted the riot as, alternatively, an enjoyable afternoon and an historic achievement, spreading the obvious lie that it was legal to invade the Capitol because the building "belongs" to Americans. By that logic, we could all invite ourselves to the White House at will.

One clear example of dishonesty is DeCarlo's claim, on his still-active fundraiser on GoGetFunding, that he did not vandalize anything. That is demonstrably false. He also sought to contrast storming the Capitol with "light[ing] a garbage can on fire," "smash[ing]…bank windows," and "tear[ing] down innocent businesses." The objective appeared to be to again depict the Capitol attack as victimless and justified. Neither is true.

DeCarlo also made highly misleading statements. For example, DeCarlo told his Murder the Media interviewer that he did not see anyone being violent with the police "inside" the building. In the same conversation, though, DeCarlo noted that he had seen pools of blood on the floor. He said he had seen "cops get overwhelmed." His statement is also misleading because it ignores what happened just outside the building – what DeCarlo called "retaliation" by the rioters, a violent struggle on the Lower West Terrace, in which he participated by lobbing a smoke grenade.

DeCarlo has also minimized his conduct by repeatedly asserting that he was an investigative reporter when he entered the Capitol who now faces prison time simply for doing a reporter's work.[112] The stolen flex cuffs, the defaced Memorial Door, and the smoke grenade all make plain just how wrong this claim is. These are the three most obvious indicators that DeCarlo was not there observing from the sidelines. He was participating in the attack. That is why he is being prosecuted. It is no defense to a crime that a person filmed himself committing it.

---

[112] This has become a not-uncommon refrain among those involved in the Capitol attack who entered the building and filmed events inside. *See* Motion to Dismiss, *United States v. Adams,* 21-cr-212 (ABJ), ECF No. 52 (seeking dismissal of Superseding Information because defendant allegedly entered the Capitol to film members of Antifa attacking Trump supporters); Memorandum in Opposition, *United States v. Costianes,* No. 21-cr-180 (RJL), ECF No. 55 at 2, 6-7 (responding to selective prosecution charge by defendant claiming to be an "influencer," who filmed himself commandeering Senators-only elevator, among other conduct, and posted videos to YouTube); Memorandum in Opposition, *United States v. Shroyer,* 21-cr-542 (TJK), ECF No. 26 at 5-10 (responding to claim by defendant, an Infowars.com host, that he had a right to enter the Capitol as a journalist) *United States v. Herrera,* No. 21-cr-619 (BAH), Aug. 18, 2022 Trial Tr. at 46, 86 (defendant claiming he entered the Capitol "for both photojournalism and our people," later admitting, "there were some times I acted out of line"); Findings of Fact and Conclusions of Law, *United States v. Rivera,* No. 21-cr-60 (CKK), ECF No. 62 (finding defendant, who had livestreamed in the Capitol on January 6, guilty)

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense
and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack
on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6
showed a blatant and appalling disregard for our institutions of government and the orderly
administration of the democratic process."[113] As with the nature and circumstances of the offense,
this factor supports a sentence of incarceration. DeCarlo's criminal conduct, which includes
corruptly obstructing an official proceeding, celebrating the breach by lighting up a cigarette, and
defacing a door with "Murder the Media," represents disrespect for the law. When DeCarlo entered
the Capitol grounds, the Capitol itself, it was abundantly clear to him that lawmakers and their
staffs, and the law enforcement officers who tried to protect them, were under siege; he told
DeCarlo that they weren't supposed to be where they were, provoking DeCarlo's joyous outburst
about felony charges.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime
generally, and specific deterrence, or the need to protect the public from further crimes by this
defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir.
2010).

---

[113] Federal Bureau of Investigation Director Christopher Wray, Statement before the House
Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"),
available                                                                                        at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[114] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### Specific Deterrence

There is some need for specific deterrence here. Notwithstanding his guilty plea, DeCarlo has not expressed any remorse or contrition. Without some indication that DeCarlo has renounced, learned from, or even regrets his conduct on January 6, there is a greater possibility that he will do something similar again. And, given his use of his media platform to support the attack on the Capitol, specific deterrence is particularly critical here, as DeCarlo has the potential to influence others to follow his lead.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its

---

[114] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.     **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). The goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the

41

degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[115]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevat sentencing considerations in this case.

---

[115] The Guidelines ranges in Capitol siege cases may be more likely to understate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Indeed, these crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other Section 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

First and foremost, the Court should compare DeCarlo with his co-defendant, Nicholas Ochs. Both should receive significant sentences.  While DeCarlo did steal flex cuffs and has marginally more criminal history than does Ochs, Ochs' sentence should be higher to reflect his role in the Proud Boys and his greater exposure to their plans for that day.

As described in the government's sentencing memorandum in Ochs' case, Ochs was an Elder within the Proud Boys. He was involved in one of the Proud Boys' chats, the Ministry of Self Defense, where members discussed plans for January 6, including discussion of preparations for violence. Ochs even told Ethan Nordean, shortly before January 6, that they would be leaders on the ground.

The Court may also wish to compare Ochs and DeCarlo with other defendants it has sentenced for committing the same crime on January 6 – although none of these other defendants were members of the Proud Boys, to the government's knowledge. DeCarlo's conduct is more aggravated in some respects than that of Matthew Bledsoe, whom the Court recently sentenced to 48 months' incarceration. *United States v. Bledsoe,* No. 21-cr-204 (BAH). Bledsoe scaled a wall to access the Capitol; DeCarlo threw a smoke grenade at the police line and defaced a door. Gov. Sent. Mem, *Bledsoe,* No. 21-cr-204, ECF No. 228, at 2. Bledsoe was inside the Capitol for 22 minutes; DeCarlo was inside for more than twice as long – and then went outside and stole flex cuffs and defaced the door. *Id.* The government's sentencing memorandum highlighted one picture Bledsoe posted on social media; Ochs and DeCarlo filmed for an audience throughout the breach.

43

Bledsoe was near a mob that chanted, "Nancy! Nancy! Nancy!" DeCarlo pointed rioters toward "Nancy's office" themselves, and he yelled "Where's Nancy?" *Id.* at 22.   DeCarlo has, however, accepted responsibility by pleading guilty, and he has been compliant on pretrial release.

The Court also sentenced Anthony Williams, No. 21-cr-377, to 60 months' incarceration for obstruction of an official proceeding, again after trial. The government did not present evidence that Williams had ties to the Proud Boys or another organized group. Like Ochs and DeCarlo, Williams entered the Capitol through the Senate Wing Doors, soon after the initial breach. Gov't Sentencing Mem., *United States v. Williams*, No. 21-cr-377, ECF No. 120 at 2. He also smoked in the Capitol (marijuana, not cigarettes). Williams was part of crowds that broke through the police line in the Crypt and resisted leaving the Rotunda, but did not throw smoke bombs at the police, like Ochs and DeCarlo. The government did not tie him to the Proud Boys or another militia group.

The Court may also wish to consider the sentence imposed on Joshua Pruitt, a member of the Proud Boys who pleaded guilty to obstruction of an official proceeding. *United States v. Pruitt,* 21-cr-23. Judge Kelly sentenced Pruitt to 55 months' incarceration. Pruitt had a more significant criminal history than Ochs and DeCarlo and participated in the riot while on pretrial release. Pruitt had an awareness of plans for violence on January 6 from his participation in Proud Boys chats; DeCarlo apparently planned to strap magazines to himself as a defensive measure. Pruitt threw a chair and a sign; DeCarlo defaced a door. Pruitt directly confronted officers that day, but did not, to the government's knowledge, commit an assault; Ochs and DeCarlo actually threw smoke grenades at the outnumbered police. And Pruitt was a new Proud Boys initiate – unlike DeCarlo, who had attained third-degree membership and knew other Proud Boys leadership he saw at the Capitol that day.

Finally, the Court should impose a more severe sentence on Ochs and DeCarlo than the sentences imposed on defendants who obstructed an official proceeding but did not engage in acts of violence against people or property, such as in *United States v. Paul Hodgkins*, 21-cr-118-RDM. Hodgkins unlawfully entered the U.S. Capitol and made it to the Senate Floor with a Trump flag. There, the United States requested 18 months' imprisonment and Hodgkins was sentenced to 8 months' imprisonment. Hodgkins was the first defendant to be sentenced for a violation of Section 1512(c)(2), having taken very early responsibility for his actions, and he neither committed nor incited violence on January 6. The facts here are different.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[116] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[116] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

Here, the parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that DeCarlo must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Ochs played in the riot on January 6.[117] Plea Agreement ¶ 12. As the Court noted at the change of plea, the plea agreement reflected an earlier estimate of damages caused by the riot at the United States Capitol (approximately $1,495,326.55), a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* As of October 14, the government's estimate had risen to $2,881,360.20. As the government noted at the change-of-plea hearing, though, it has not required defendants to agree to pay greater restitution following the upward revision of the damages figure but may do so in the future. The $2000 restitution figure is sufficient to encompass the costs associated with painting over the "Murder the Media" graffiti, which was completed within weeks of the Capitol attack at an estimated cost of $92.

DeCarlo's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 119.

## VIII.   FINE

DeCarlo's conviction under Section 1512 subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to

---

[117] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

"capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. DeCarlo has raised funds in an online campaign. DeCarlo's GoGetFunding campaign appears to have raised over $7,096. The campaign indicates that it was to be used for travel to D.C. for court, new clothes to wear to court, and "living with his current restrictions." The upcoming sentencing hearing will be DeCarlo's first trip to Washington, D.C. It is not a trip that should cost $7,093; based on internet research conducted on November 20, 2022, $550 would be enough to cover roundtrip airfare and a mid-range hotel. The government therefore requests that he be fined $6,543. DeCarlo should not be able to "capitalize" on his participation in the Capitol breach.[118]

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 48 months, which is within the Guidelines range as calculated by the government and as agreed upon by the parties in the plea agreement, restitution of $2,000, a fine, and the mandatory $100 special assessment.

---

[118] The government reserves the right to ask for a greater fine at the sentencing hearing should it learn of additional contributions DeCarlo has obtained.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    */s/ Alexis J. Loeb*
        ALEXIS J. LOEB
        CA Bar No. 269895
        Assistant United States Attorney
        Detailed to USAO-DC
        U.S. Attorney's Office
        450 Golden Gate Ave., 11th Floor
        San Francisco, CA 94102
        Office: (415) 436-7168
        Alexis.Loeb@usdoj.gov