**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-73 (BAH)** |
| **v.** | : | |
| | : | |
| **NICHOLAS DECARLO and** | : | |
| **NICHOLAS OCHS,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS' REQUEST FOR RELEASE
PENDING ADJUDICATION OF THEIR MOTION UNDER 28 U.S.C. § 2255**

The United States of America, by and through its undersigned attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendants Nicholas DeCarlo and Nicholas Ochs' request for immediate release pending adjudication of their motion to vacate their convictions under 28 U.S.C. § 2255 (ECF 112) ("§ 2255").

Ochs, a senior Proud Boys leader, and DeCarlo, a former high-ranking Proud Boys member, assaulted officers, defaced the Capitol with graffiti declaring "Murder the Media," and stole a pair of flex cuffs. They enjoyed a smoke in the Crypt, waved rioters toward Speaker Pelosi's office—precipitating a violent confrontation with police—and filmed a self-congratulatory video where they celebrated stopping Congress's certification proceeding "when we stormed the Capitol. They planned their trip together, prepared for violence, moved together throughout the day, coordinated with other Proud Boys, and celebrated together after.

Ochs and DeCarlo each pled guilty to a single violation of 18 U.S.C. § 1512(c)(2) ("§ 1512(c)(2)") pursuant to a plea agreement in which they admitted to committing all these acts and intentionally obstructing the certification of the Electoral College vote. In their plea agreements, the government dismissed and agreed not to bring other charges against them, and the defendants agreed not to appeal and not to collaterally attack their convictions.

They now seek to set aside that bargain because the Supreme Court narrowed the meaning of § 1512(c)(2) in *Fischer v. United States,* 603 U.S. ___, 144 S. Ct. 2176, 2024 WL 3208034 (June 28, 2024), and they seek immediate release. But Ochs and DeCarlo should not be released because they cannot meet the legal standard for release pending adjudication of their § 2255 collateral attack: they show neither a substantial claim nor exceptional circumstances, and the law requires both. On the latter requirement, the defendants do not even attempt to make a showing of exceptional circumstances. Each defendant has roughly 15 months remaining before his prospective release date, and neither cites any medical or other reasons warranting release now. That alone requires denial of their request.

On the former (their petition must establish a substantial claim), regardless of whether *Fischer* raises a question as to the viability of pending § 1512(c)(2) charges, these defendants are in a different posture. In their plea agreements, they unambiguously waived their right to file a § 2255 motion. At the time, legal challenges to § 1512(c)(2) were ongoing, and the defendants had filed one such challenge themselves. In exchange for their guilty plea to a single count, the government dismissed or did not bring several other charges of equal or greater seriousness against them. That was the bargain these defendants struck: they chose to limit their exposure and obtain finality rather than continue to press their case. Courts, including the D.C. Circuit, have declined to undo such waivers based on arguments that the law later changed or that the district court got the law wrong. They have recognized that enforcing such waivers benefit both parties by allowing defendants to use their appellate and collateral review rights as leverage and receive benefits in exchange. This Court should do the same.

The defendants also fail to establish a substantial claim because their § 2255 motion is procedurally defaulted (they filed no direct appeal and cannot establish cause), and they do not

make the actual innocence showing required to overcome their default. This is so for two independently sufficient reasons. First, the government forwent equally or more serious charges against them in connection with the plea, such as assault charges for the smoke bombs they admitted they threw. While the Court can stop there, these defendants also do not meet their burden to show, based on all the evidence, that they are factually innocent under the post-*Fischer* § 1512(c)(2) standard: that *no* reasonable jury would convict them of taking or attempting to take some action with respect to a record, document, or other thing (such as the electoral certificates) to obstruct the certification of the Electoral College vote. The Court should reject the defendants' request for immediate release.

## BACKGROUND

### I. The Defendants' Conduct on January 6

The defendants' statements of offense and the government's sentencing memoranda describe the defendants' conduct on January 6, and the government incorporates them by reference. *See* ECF 79 (DeCarlo Statement of Offense); 82 (Ochs Statement of Offense);[1] 93 (Gov't Sent. Mem. as to DeCarlo) ("DeCarlo Sent. Mem"); 94 (Gov't Sent. Mem. as to Ochs) ("Ochs Sent. Mem."); 101 (Gov't Reply Sent. Mem. as to DeCarlo).

Ochs was an Elder, a member of the Proud Boys' senior leadership counsel; DeCarlo was a former third-degree Proud Boys member. ECF 82 ¶ 8. Ochs and DeCarlo ran a social media platform called "Murder the Media," which they used to offer political and social commentary. *Id.* ¶ 19. They planned to travel to Washington, D.C. for January 6 and, in various communications

---

[1] Ochs and DeCarlo's Statements of Offense are nearly identical except for two paragraphs providing some background information regarding each defendant and his travel to Washington, D.C. (ECF 79 ¶ 8; ECF 82 ¶¶ 8-9). Each sentencing memorandum also contains substantial overlapping information regarding the defendants' joint conduct; the government generally does not cite both sentencing memoranda for common points.

on social media, communicated their belief that the election had been stolen and prepared for violence. *Id.* ¶ 9; ECF 93 at 3-4; ECF 94 at 3-11. Ochs also coordinated with other members of the Proud Boys, at one point commenting that he and Ethan Nordean would be senior leadership on the ground after Proud Boys chairman Enrique Tarrio was arrested. ECF 94 at 9. He also made predictions about how the Supreme Court would address election-related challenges. *Id.* at 6-7.

Ochs and DeCarlo stayed together at a hotel on January 5 and went to the Capitol the following day together, filming throughout. *See, e.g.,* ECF 79 at ¶¶ 8-18. At the Capitol, they laughed as they encountered downed fencing and violence on the West Plaza. ECF 94 at 12-13. As the battle between rioters and police intensified, they joined in, discussing how to deploy smoke grenades and launching them at the police. *Id.* at 15-19; ECF 79 ¶ 12; ECF 82 ¶ 13. Filming the huge crowd, DeCarlo asked, "Do you think they are scared in there?" ECF 94 at 29. Ochs replied, "Yeah, and I fucking love it!" *Id.*

Within ten minutes of the initial breach, they entered the Capitol. ECF 79 ¶ 13; ECF 82 ¶ 14; After yelling "where's Nancy?" in a singsong voice, they posed for pictures with celebratory cigarettes in the Crypt. ECF 79 ¶ 14; ECF 82 ¶ 15; ECF 94 at 21-23. They laughed as rioters forced open a metal door that police had tried to close to seal off access to the Visitors' Center, which contained tunnels leading to other parts of the Capitol. ECF 79 ¶ 15; ECF 82 ¶ 16; ECF 94 at 23. After reuniting with other Proud Boys, they entered the Rotunda, where they pointed rioters toward Speaker Pelosi's office. ECF 79 ¶ 16-17; ECF 82 ¶ 17-18; ECF 94 at 26-27. A crowd soon formed and rushed at the police line guarding the area. ECF 94 at 27.

When they left the Capitol Building at 3:00 p.m., their criminal activity did not stop. ECF 79 ¶ 17; ECF 82 ¶ 18; ECF 94 at 28. They wrote "Murder the Media" with a thick pen on the Memorial Door of the Capitol. ECF 79 ¶ 18; ECF 82 ¶ 19; ECF 94 at 28-30. DeCarlo stole a pair

of flex cuffs from a Capitol Police bag. ECF 79 ¶ 19; ECF 82 ¶ 20. As they walked away from the Capitol that day, Ochs said, "sorry we couldn't go live when we stormed the fuckin' U.S. Capitol and made Congress flee," and DeCarlo laughed and flashed a thumbs-up sign. ECF 79 ¶ 20; ECF 82 ¶ 22. And later that day, they filmed themselves reacting to the headline that "Congress stopped the vote when we stormed the Capitol." ECF 79 ¶ 21; ECF 82 ¶ 23. Their reaction: "as we've been saying all day, we came here to stop the steal. Ochs said, "It may resume, but the steal is for now stopped. You're welcome, America!" to which DeCarlo replied "we did our job. We did our job." *Id.* DeCarlo later gave multiple interviews recounting what he had seen, celebrating what had happened, minimizing his own conduct, and complaining about Vice President Pence and "half of the Republicans" who were "not there for us." ECF 93 at 22-30; ECF 101 at 1-2.

## II. Procedural Background

The defendants were arrested in January 2021, and charged by indictment the next month with conspiracy, in violation of 18 U.S.C. § 371 (with a § 1512(c)(2) object), obstruction of an official proceeding, in violation of § 1512(c)(2), and five misdemeanor charges. ECF 17. DeCarlo moved to dismiss the § 1512(c)(2) charge and the conspiracy charge. ECF 12. Ochs joined the motion. ECF 56. The Court denied the motion. Jan. 21, 2022 Minute Entry. At the time, the application of § 1512(c)(2) to January 6 defendants was being heavily litigated across the district, with multiple rounds of briefing in some cases and several district courts issuing lengthy opinions. *See, e.g., United States v. Montgomery*, 578 F. Supp. 3d 54, 59 (D.D.C. 2021); *United States v. Caldwell*, 581 F. Supp. 3d 1, 7 (D.D.C. 2021). In March, 2022, in decisions that became the subject of the Supreme Court litigation that gives rise to defendants' motion, Judge Nichols agreed with arguments being raised by January 6 defendants, dismissed rioters' § 1512(c)(2) charges, and denied motions for reconsideration. *See United States v. Miller*, 589 F. Supp. 3d 60, 63 (D.D.C.),

*reconsideration denied*, 605 F. Supp. 3d 63 (D.D.C. 2022), and *rev'd and remanded sub nom.*
*United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023), *cert. granted*, 144 S. Ct. 537 (2023), and
*vacated and remanded*, 144 S. Ct. 2176 (2024), and *cert. granted, judgment vacated sub nom.*
*Miller v. United States*, No. 23-94, 2024 WL 3259658 (U.S. July 2, 2024), and *cert. granted,*
*judgment vacated sub nom. Lang v. United States*, No. 23-32, 2024 WL 3259659 (U.S. July 2,
2024); *United States v. Fischer*, No. 1:21-CR-00234 (CJN), 2022 WL 782413, at *1 (D.D.C. Mar.
15, 2022), *rev'd and remanded*, 64 F.4th 329 (D.C. Cir. 2023), *cert. granted*, 144 S. Ct. 537 (2023),
and *vacated and remanded*, 144 S. Ct. 2176 (2024).

In this case, the grand jury returned a superseding indictment on February 18, 2022, that
removed one of the misdemeanor counts. ECF 68. The Court set trial for November 15, 2022, with
pretrial motions due September 15. Feb. 23, 2022 Minute Order.

**A. Evidence of Additional Felony Conduct, Guilty Pleas, Waiver, and Sentencing**

The government began preparing for trial and, on May 12 and 13, 2022, disclosed videos
showing the defendants throwing objects at the police during the violent confrontation on the
Capitol's West Front and discussing needing to "pull the pin" first. The government explained that
these videos were evidence of additional felony conduct by the defendants, and plea negotiations
began.

The parties proceeded to negotiate an agreement in which the defendants agreed to plead
guilty to a violation of § 1512(c)(2), and the government agreed to dismiss the remaining charges
and not bring additional charges for the conduct described in the statement of offense (which
included defendants' admission that they threw smoke bombs at police). Plea Agreement, ECF 77
(DeCarlo Plea Agreement), 81 (Ochs Plea Agreement) at ¶¶ 1 (agreements to plead guilty), 4
(agreements not to further prosecute); ECF 79 ¶ 12; ECF 82 ¶ 13 (smoke bomb admissions). Each

also admitted that he "attempted to or did obstruct or impede an official proceeding," that he "intended to obstruct or impede the official proceeding," and that he acted "knowingly, with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding," and that he acted "corruptly." ECF 79 ¶ 22; ECF 82 ¶ 24. The parties calculated the offense level at 22 after credit for acceptance of responsibility. ECF 77, 81 ¶ 5(A).

The plea agreements also included the following collateral attack waiver:

> Your client also waives any right to challenge the conviction entered or sentence imposed under this Agreement or otherwise attempt to modify or change the sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under 28 U.S.C. § 2255 or Federal Rule of Civil Procedure 60(b), except to the extent such a motion is based on newly discovered evidence or on a claim that your client received ineffective assistance of counsel. Your client reserves the right to file a motion brought under 18 U.S.C. § 3582(c)(2).

ECF 77 ¶ 10(D), 81 ¶ 10(D). Each defendant signed the plea agreement and the statement of offense. ECF 77 at 11, ECF 79 at 8, ECF 81 at 11, ECF 82 at 8. On September 9, 2022, the Court conducted a colloquy and accepted defendants' guilty pleas. Sept. 9, 2022 Minute Entry.

On December 9, 2022, the Court sentenced the defendants to 48 months' imprisonment each, and the government dismissed the remaining counts of the Superseding Indictment. Dec. 9, 2022 Minute Entry. Judgments issued the same day. ECF 106, 108. Neither defendant filed an appeal.

According to the Bureau of Prisons' website (https://www.bop.gov/inmateloc/), DeCarlo's current release date is October 9, 2025, and Ochs' current release date is October 20, 2025.

**B. *Fischer v. United States***

On June 28, 2024, the Supreme Court issued its decision in *Fischer,* narrowing § 1512(c)(2). The Court held that § 1512(c) does not cover "all means of obstructing, influencing, or impeding any official proceeding." 144 S. Ct. at 2185. However, the Court did not reject the

application of § 1512(c)(2) to January 6 prosecutions across the board. Rather, the Court explained that the government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or other things used in the proceeding – such as witness testimony or intangible information—or attempted to do so. *Id.* at 2186, 2190. The Supreme Court remanded the case to the D.C. Circuit for further proceedings. *Id.*

The defendants moved to vacate their convictions under 28 U.S.C. § 2255 on July 9, 2024, citing *Fischer*. ECF 112. They request immediate release.

## LEGAL STANDARD

### I.      Release Pending Habeas Review

In contrast to a request for bail pending a direct appeal under 18 U.S.C. § 3143(b), a request for release pending adjudication of a habeas petition will " 'ordinarily […] be measured against a heightened standard requiring a showing of exceptional circumstances.'" *United States v. Kelly*, 790 F.2d 130, 139 (D.C. Cir 1986) (quoting *Baker v. Sard*, 420 F.2d 1342, 1343 (D.C. Cir. 1969)). In addition to identifying "exceptional circumstances deserving of special treatment," the petitioner must show that "the § 2255 petition is based on a substantial claim of law." *See United States v. Stottlemyer*, No. CR 21-334-2 (TJK), 2024 WL 1076852, at *3 (D.D.C. Mar. 8, 2024); *Meskel v. United States*, No. CRIM.A. 04-0053 (RMU), 2005 WL 1903375, at *2 (D.D.C. July 13, 2005); *see also United States v. Young*, 249 F. Supp. 3d 11, 13-14 (D.D.C. 2015) (quoting *United States v. Taylor*, 254 F.3d 1080, 1080 (5th Cir. 2001) ("Release pending disposition of a 28 U.S.C. § 2255 motion will be granted only when the petitioner has raised a substantial constitutional claim upon which he has a high probability of success, and also when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective.")). This is a "stringent" standard. *Meskel*, 2005 WL 1903375, at *2 (quoting

*Dotson v. Clark*, 900 F.2d 77, 79 (6th Cir. 1990)); *accord Martin v. Solem*, 801 F.2d 324, 329 (8th Cir. 1986) (when requesting bail pending collateral review, the defendant must show "a substantial federal constitutional claim that presents not merely a clear case on the law, but a clear, and readily evident, case on the facts"); *United States v. Roberts*, 250 F.3d 744 (5th Cir. 2001) (petitioner must raise "substantial constitutional claims upon which he has a high probability of success").

"[T]he power to grant bail pending resolution of a § 2255 proceeding is to be exercised very sparingly." *Id.* at 139 (citing *Cherek v. United States*, 767 F.2d 335, 337 (7th Cir. 1985)). Very few defendants should be released under this analysis. *See Bruce v. United States*, 256 F. Supp. 28, 29 (D.D.C 1966) (court has inherent authority to admit § 2255 defendant to bail, but it should only be exercised when "exceptional circumstances" have been shown). Cases presenting exceptional circumstances "'are typically limited to situations involving the impending completion of short sentences or grave illness.'" *Stottlemyer*, 2024 WL 1076852 at *5 (quoting *Meskel*, 2005 WL 1903375 at *2); *see also Roberts*, 250 F.3d at 744 (explaining that exceptional circumstances include "serious deterioration of the petitioner's health while incarcerated, short sentences for relatively minor crimes so near completion that extraordinary action is essential to make collateral review truly effective, and extraordinary delay in processing a habeas petition").

## II.    18 U.S.C. § 2255

A defendant may move to vacate, set aside, or correct a sentence if he believes the sentence was imposed "in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. The relief contemplated by § 2255 "does not encompass all claimed errors in conviction and sentencing." *United States v. Addonizio*, 442 U.S. 178, 185 (1979). "Because of the premium placed on the

finality of judgments, there are limited circumstances under which a court should grant a Section 2255 motion." *Bedewi v. United States*, 583 F. Supp. 2d 72, 76 (D.D.C. 2008) (internal quotation marks omitted).

A defendant bears the burden of demonstrating that he is entitled to relief under § 2255. *See, e.g., United States v. Bell*, 65 F. Supp. 3d 229, 231 (D.D.C. 2014). It is "well-settled" that "to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982); *see also United States v. Pollard*, 959 F.2d 1011, 1020 (D.C. Cir. 1992). A judgment challenged on collateral attack carries with it a "presumption of regularity," "even when the question is waiver of constitutional rights." *Daniels v. United States*, 532 U.S. 374, 381 (2001) (internal quotation marks omitted).

## ARGUMENT

The defendants' motion presents no exceptional circumstances warranting release pending review of their § 2255 motion. They acknowledge that they will not be released until the fall of 2025, and then reiterate their belief that *Fischer* exonerates them. The Court could deny the request on this basis alone.

The defendants' request for release also lacks merit because their motion does not raise a substantial claim. They argue that their guilty pleas must be vacated because they were not informed that their obstruction had to involve documents, records, or other objects. ECF 112 at 5. Ignoring the fact that they admitted to throwing smoke bombs at the police (not to mention defacing the Capitol and stealing property), they claim they "pled guilty because they were physically present in the Capitol." *Id.* at 5. Their misleading depiction of this case obscures the fact that Ochs and DeCarlo made a bargain—a bargain from which they benefited, which allowed them to plead guilty to a single felony count, when the government dismissed several charges in

connection with the guilty plea and could have brought multiple other charges against them. The defendants reached this bargain at a time when they D.C. Circuit and the Supreme Court had not yet decided the scope of § 1512(c)(2), a statute they themselves had challenged. Through their plea bargain, the parties allocated the risk of the unknown: future charges by the government, and future developments in the law. The defendants unambiguously gave up the right to bring a collateral attack, and the Court should enforce the parties' bargain, as courts have done in similar circumstances where a defendant tries to invalidate a plea by claiming the court informed him of statutory requirements incorrectly because the law subsequently changed in his favor.

Even if the Court declined to enforce the waiver, the defendants would still fail to show that their petition raises a substantial claim. They do not address their procedural default at all, which requires them to establish "actual innocence" under *Bousley v. United States,* 523 U.S. 614, (1998) to prevail. They cannot. The government forwent several charges of equal or greater seriousness in connection with the plea, and the defendants make no argument at all establishing that no reasonable jury would convict them of those charges. This too is reason enough to deny the request for release. And while the Court need not reach the question of defendants' innocence under *Fischer* at this juncture—because of all the other sufficient reasons to deny their request for release—defendants also do not make out a readily evident case on the full factual record that no reasonable jury would convict them of violating § 1512(c)(2), as they must to meet the standard for release in this posture.[2] The defendants should remain in custody pending adjudication of their motion.

---

[2] The government's decision not to address certain procedural requirements or merits-related issues in this opposition to defendants' request for release should not be viewed as a concession or waiver barring the government from raising such issues in its response to defendants' § 2255 motion itself, which is due September 9. In this brief, the government focuses solely on the issues that are, in its view, most relevant to the defendants' request for immediate release. The government reserves the right to address any issues raised by defendants' motion in full.

## I.      The Defendants Fail to Show Exceptional Circumstances Warranting Their Release

The defendants' request for release fails at the threshold because they do not demonstrate "exceptional circumstances deserving of special treatment." *See Stottlemyer*, 2024 WL 1076852, at *3. Their petition argues solely that they were wrongly convicted, and thus presents no such "exceptional circumstances," such as "'serious deterioration of the petitioner's health while incarcerated, short sentences for relatively minor crimes so near completion that extraordinary action is essential to make collateral review truly effective, and extraordinary delay in processing a habeas petition.'" *Id.* at *5 (citing *Roberts,* 250 F.3d at 744). These defendants each have more than one year left to serve; their habeas petitions have been pending for less than one month; and, to the government's knowledge, none suffers from grave illness. No "extraordinary action is essential to make collateral review truly effective." *Roberts*, 250 F.3d at 744. The Court should deny their request for release on this basis alone.[3]

## II.     The Defendants Should Not Be Released Because Their Motion Fails to Raise a Substantial Claim

The defendants' request for release also lacks merit because the defendants' § 2255 motion fails to raise a "substantial claim" for relief, for several reasons.

### A. The Defendants' Motion Does Not Raise A Substantial Claim Because They Waived the Right to File It

---

[3] The defendants' supplement notes that the government agreed to release another January 6 defendant, Jorge Riley, 21-cr-69 (APM). ECF 113 at 1. The government's decision in another case does not establish exceptional circumstances as to these defendants. In any event, there are important distinctions. For example, to the government's knowledge, Riley did not assault officers or commit other crimes of equal or greater seriousness. Aside from the violation of § 1512(c)(2), he was charged only with the four standard misdemeanors (18 U.S.C. §§ 1752(a)(1)-(2) and 40 U.S.C. § 5104(e)(2)(D)-(G)). His 18-month sentence was much also closer to completion (November of 2024)—approximately one year earlier than these defendants' release date.

The defendants' motion does not address the fact that they waived the right to bring this motion through unambiguous language in their plea agreements:

> Your client also waives any right to challenge the conviction entered or sentence imposed under this Agreement or otherwise attempt to modify or change the sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under 28 U.S.C. § 2255 or Federal Rule of Civil Procedure 60(b), except to the extent such a motion is based on newly discovered evidence or on a claim that your client received ineffective assistance of counsel. Your client reserves the right to file a motion brought under 18 U.S.C. § 3582(c)(2).

ECF 77 ¶ 10(D), 81 ¶ 10(D). The defendants' motion is based on *Fischer,* not newly discovered evidence, nor does it claim ineffective assistance of counsel. By the plain language of the plea agreement, the defendants have waived the right to bring this motion. They thus fail to raise a substantial claim meriting release.

Criminal defendants may waive constitutional and statutory rights as long as the waiver is knowing and voluntary. *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995). *See, e.g., Ricketts v. Adamson*, 483 U.S. 1, 9-10 (1987) (waiver of right to raise double-jeopardy defense); *Town of Newton v. Rumery*, 480 U.S. 386, 389, 398 (1987) (waiver of right to file constitutional tort action).

The language of a collateral waiver in a plea agreement is interpreted as a contract and will "preclude[] challenges that fall within its scope" if it is knowing and voluntary and thus enforceable. *Garza v. Idaho*, 139 S. Ct. 738, 744-745 (2019). The D.C. Circuit has affirmed the enforcement of appellate waivers. "The basic principle behind an appeal waiver is that the defendant *gives up* his right to have an appellate court review the merits of his arguments in exchange for valuable consideration." *Khadr v. United States,* 67 F. 4th 413, 424 (D.C. Cir. 2023), *cert. denied*, No. 23-720, 2024 WL 2262403 (U.S. May 20, 2024). "Allowing the defendant to waive this right . . . improves the defendant's bargaining position and increases the probability he will reach a satisfactory plea agreement with the Government." *United States v. Guillen*, 561 F.3d

527, 530 (D.C. Cir. 2009). So too with collateral waivers. *See, e.g., United States v. Koontz*, No. 16-cr-16 (EGS), 2024 WL 3225980, at *6 (D.D.C. June 28, 2024) (citing *Guillen* and declining to issue a certificate of appealability as to claims in § 2255 motion barred by collateral-attack waiver in plea agreement).

Moreover, "[t]he principle that future changes in law do not vitiate collateral-challenge waivers is mainstream." *Portis v. United States*, 33 F.4th 331, 335 (6th Cir. 2022). Other circuits have accordingly affirmed the enforcement of collateral-attack waivers in similar circumstances, rejecting defendants' arguments that a later Supreme Court decision voids their plea agreement because they are allegedly no longer guilty of the offense to which they pled. As the Sixth Circuit has explained: "Subsequent developments in the law that would make a right to bring a postconviction challenge more valuable do not suddenly make the plea involuntary or unknowing or otherwise undo its binding nature." *Id.* (citation omitted). Thus, "waivers of the right to bring postconviction challenges remain enforceable after changes in law." *Id.*

For example, after the Supreme Court limited what crimes qualify as crimes of violence under 18 U.S.C. § 924(c) in *United States v. Davis*, 588 U.S. 445 (2019), numerous defendants convicted pursuant to plea agreements filed collateral attacks, claiming that there was no longer a predicate justifying their 18 U.S.C. § 924(c) convictions. Like Ochs and DeCarlo, they argued that they had been convicted of an act the law no longer made criminal, and that courts should set aside their plea agreements' collateral-attack waivers and allow them to file § 2255 challenges. Several circuits, however, recognized that enforceability of a collateral attack *waiver* is a separate question from the validity of the *conviction*: "the enforceability of a collateral-attack waiver turns on whether the prisoner's agreement *to the waiver* was knowing and voluntary, not whether the underlying conviction itself no longer appears valid after a change in law." *Portis,* 33 F.4th at 337.

Rejecting one such claim, the Sixth Circuit observed that collateral waivers would "lose all effect" if they could be set aside simply by challenging the validity of underlying conviction. *Id.* (citation omitted).[4] "In the short term, that might seem helpful to criminal defendants. But in the long term, it would eliminate a bargaining tool to convince the government to drop pending charges against a defendant." *Id.* at 336. Because the defendants expressly waived their rights to bring collateral challenges, and because the waiver was knowing and voluntary, despite a change in the law undermining their convictions, the waivers were enforceable. *Id.*

The Second Circuit has likewise rejected a claim that defendants' pleas and collateral attack waivers were invalid after a change in law because they had a "due process right not to be convicted of a non-existent offense." *Cook v. United States*, 84 F.4th 118, 125 (2d Cir. 2023). *Cook,* like *Portis,* also involved defendants who pled guilty to violating 18 U.S.C. § 924(c) (and conspiracy to commit Hobbs Act robbery), waived their rights to appeal and collaterally attack their convictions, and then, after *Davis,* filed § 2255 motions to set aside their convictions. The Second Circuit enforced the collateral-attack waiver, finding that "the enforceability of a collateral-attack waiver turns on whether the petitioner's plea was knowing and voluntary, not the nature of any subsequent legal developments." *Id.* at 124. Addressing the argument that defendants had a due-process right not to be convicted of a nonexistent offense, the Second Circuit reframed the question: "the question is not whether Petitioners have a right not to be convicted of a non-existent offense. It is whether Petitioners have a right to bring a collateral attack when, in exchange for

---

[4] The Sixth Circuit also distinguished *Bousley,* where the defendant had *not* waived the right to collaterally attack his conviction.  It found that "a future defendant may do what Bousley did not, namely agree to waive collateral attacks on his conviction no matter what future developments in the law bring." *Id.*  "The [*Bousley*] Court held only that the guilty plea in that case was unknowing, not that a collateral-attack waiver would be unknowing or unenforceable. It is one thing to knowingly plead guilty to the elements of a crime; it is quite another to knowingly waive collateral challenges to a conviction." *Id.* at 338.  Here, like in *Portis* and unlike in *Bousley*, there is an express waiver of collateral attacks.

valid consideration, they executed binding plea agreements admitting their criminal conduct and waiving their ability to challenge the resulting convictions." *Id.* at 125. In summary, "a waiver of the right to bring a postconviction challenge is presumptively enforceable, even after the legal landscape shifts." *Id.*

The Ninth Circuit also agrees that a "change in the law does not make a plea involuntary and unknowing." In *United States v. Goodall*, 21 F.4th 555, 562–64 (9th Cir. 2021)), *cert. denied*, 142 S. Ct. 2666 (2022), the defendant, who had pled guilty and waived the right to appeal, also argued his appellate waiver and plea were no longer enforceable after *Johnson* and *Davis*. *Goodall* rejected the claim that the defendant had not foreseen a change in the law when he waived his appellate rights. *Id.* at 562. "When a defendant waives his appellate rights, he knows that he is giving up all appeals, no matter what unforeseen events may happen." *Id.* And, in *Goodall,* the defendant received benefits from his plea: "the government dropped one § 924(c) count (which reduced the mandatory minimum sentence by 25 years) and agreed to recommend a 240-month sentence. When Goodall agreed to this plea agreement, he apparently believed that it was a good deal for him. Just because Goodall's choice looks less favorable with the benefit of hindsight does not make the choice involuntary." *Id.* (citation omitted). "A plea agreement is no different in this respect from any other contract in which someone may have buyer's remorse after an unforeseen future event—the contract remains valid because the parties knowingly and voluntarily agreed to the terms." *Id.*

Simply put, "[t]here is no do-over just because a defendant later regrets agreeing to a plea deal." *Id*.; *see also Oliver v. United States*, 951 F.3d 841 (7th Cir. 2020) ("One major purpose of an express waiver is to account in advance for unpredicted future developments in the law."). As the Seventh Circuit, also enforcing a collateral-attack waiver after a change in law undermined a

defendant's conviction, asked: "If a defendant can make a seemingly beneficial plea agreement and can then renege on his deal and maintain an appeal, then why would the government make these kinds of deals in the future? Why wouldn't the government instead just charge defendants with all applicable crimes and see what sticks after the appeal?" *Oliver,* 951 F.3d at 845 (citation omitted). If defendants could always void a waiver based on some change in the law, collateral waivers would lose much of their value.

The D.C. Circuit's decision in *Khadr,* 67 F. 4th at 424, enforcing an appellate waiver, suggests that it will follow the same course here. Khadr argued that his military-commission plea was not knowingly made because the military judge had erroneously "ruled against him on the merits of his legal claims" and thereby "misinformed him about the nature and constitutionality of the charges against him." *Id.* Khadr's position resembles Ochs' and DeCarlo's argument that the Court misinformed them of the elements of § 1512(c)(2) and that their pleas are thus invalid. ECF 112 at 5. The D.C. Circuit rejected this argument, calling it "too clever by half." *Id.* at 424. The panel explained that Khadr could not "challenge [his] plea based on an alleged error of law that was raised, rejected[,] and then waived pursuant to the plea" where petitioner was "aware that the military judge had rejected his theories" yet "nonetheless chose to plead guilty and expressly waive his right to appeal those erroneous (in his view) rulings." *Id.* The same logic applies here. Ochs and DeCarlo "cannot now have the merits of [their] waived claims reviewed on appeal by arguing [their] waiver was invalid because those claims were wrongly decided." *Id.*

Enforcing the waiver here is just. It was no surprise that legal questions surrounded § 1512(c)(2)'s application to January 6 defendants. Ochs and DeCarlo themselves had filed a motion to dismiss attacking the statute. Shortly before they engaged in plea negotiations, another judge in the district had issued a contrary interpretation of the statute; while they were negotiating

their pleas, an appeal to the D.C. Circuit was filed. *See Miller*, 589 F. Supp. 3d 60; Transmission of Notice of Appeal, *Fischer,* 21-cr-234 (CJN), ECF 86 (D.D.C. June 22, 2022). They chose to give their up their own rights to appeal the Court's decision, and, like Khadr, they received benefits in exchange. They were permitted to plead guilty to only one offense, and they received the certainty that they would not face future charges for the conduct described in the Statement of Offense.). And, as described further below, the government could have brought multiple other felony charges here, particularly because Ochs and DeCarlo were captured on video throwing smoke bombs at the police together. The government also agreed that defendants would be entitled to a three-point acceptance of responsibility credit (with limited exceptions that did not ultimately apply).

Ochs and DeCarlo's negotiated agreements stand in contrast to some other defendants who did not waive their appellate rights and instead participated in fully stipulated trials. Most of these defendants had to admit guilt on other charges in addition to the § 1512(c)(2) charge. Because Ochs and DeCarlo agreed to give up their appellate and collateral attack rights and agree to the greater certainty of a plea agreement, they were permitted to plead guilty to one offense only. *Cf.* Statement of Facts for Stipulated Trial, *United States v. Bender,* 21-cr-508 (BAH), ECF 93 at 19-20 (D.D.C. Dec. 7, 2022) (admitting guilt on six counts); *United States v. Southard-Rumsey,* 21-cr-387 (APM), ECF 64 at 21-24 (D.D.C. Jan. 27, 2023) (admitting guilt on nine counts, including three violations of 18 U.S.C. § 111(a)). Had Ochs and DeCarlo wanted to preserve their rights to continue to litigate § 1512(c)(2), they could have proceeded without a plea agreement, sought to except the issue from their broad waiver of appellate and collateral rights, or negotiated a stipulated trial. Instead, they chose to waive their rights to appeal and collaterally attack their sentences in

order to obtain an agreement that conferred benefits. In these circumstances, it is fair to enforce the parties' bargain, which includes an unambiguous waiver of their right to file a collateral attack.

The defendants do not acknowledge their waiver, let alone establish a substantial claim as to its validity. The Court should reject their request for release on this basis alone.

## B.  The Defendants' Motion is Procedurally Defaulted and They Do Not Raise a Substantial Claim as to their Actual Innocence on Forgone Charges or on the Offense of Conviction.

Even without the waiver, Ochs and DeCarlo's § 2255 motion would fail. It is procedurally defaulted because the defendants never sought direct review of their claims. Because they cannot establish cause for their default, Ochs and DeCarlo must demonstrate actual innocence, but, for two independent reasons, their motion does not raise a substantial claim as to this issue either. First, the government forwent charges of equal or greater seriousness in connection with the plea. Second, they do not raise a substantial claim, on the full factual record, that it is more likely than not that no reasonable jury would convict them of violating § 1512(c)(2).

### 1.  The Defendants Fail to Raise a Substantial Claim as to Procedural Default

"The procedural default rule generally precludes consideration of an argument made on collateral review that was not made on direct appeal, unless the defendant shows cause and prejudice." *United States v. Hughes*, 514 F.3d 15, 17 (D.C. Cir. 2008); *United States v. Pettigrew*, 346 F.3d 1139, 1144 (D.C. Cir. 2003). To establish cause, a defendant must demonstrate "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim," such as government interference or that the factual or legal basis for the claim was not reasonably available. *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991) (internal quotation omitted). A defendant "bears the burden of showing both" cause and actual prejudice. *Hicks*, 911 F.3d at 627 (citation omitted).

"Inexplicably, [defendants'] opening brief does not acknowledge the existence of the procedural default rule." *Hughes,* 514 F.3d at 17. Under that rule, Ochs and DeCarlo cannot establish cause. A claim that is truly "novel"—where the law at the time did not provide counsel with a "reasonable basis" for the claim—can constitute "cause" to excuse a procedural default, *Bousley*, 523 U.S. at 622 (*quoting Reed v. Ross*, 468 U.S. 1, 16 (1984)). This Court has recognized that novelty exists in at least three circumstances:

> (1) the Supreme Court explicitly overrules its own precedent; (2) the Supreme Court changes course on a "longstanding and widespread practice to which [the Supreme Court had] not spoken, but which a near-unanimous body of lower court authority has expressly approved"; and (3) the Supreme Court disapproves of a once-sanctioned practice.

*United States v. Hammond,* 351 F. Supp. 3d 106, 123 (D.D.C. 2018) (citing *Reed,* 468 U.S. at 17, 104 S. Ct. 2901 (quoting *United States v. Johnson*, 457 U.S. 537, 551 (1982))). The fact that this Court had ruled against defendants' claim is not dispositive. "Futility cannot constitute cause if it means simply that a claim was 'unacceptable to that particular court at that particular time.'" *Bousley*, 523 U.S. at 623 (quoting *Engle v. Isaac*, 456 U.S. 107, 130 n.35 (1982)).

This case does not come close to establishing cause. Defendants identify no external factor preventing them from bringing this claim, which is not novel.[5]   The application of § 1512(c)(2) was an open question in the D.C. Circuit (and the Supreme Court) at the time of defendants' plea and sentencing, one district judge had ruled in defendants' favor, and defendants across the district, including *these defendants*, had filed motions to dismiss challenging the statute's application to

---

[5] An appeal waiver in a plea agreement does not constitute cause to overcome a procedural default. An appellate waiver is not a "factor external to the defense;" the defendants themselves agreed to it.  *Carter v. United States*, No. 18-12723-B, 2018 WL 8667010, at *2 (11th Cir. Oct. 12, 2018) (appellate waiver does not constitute cause excusing procedural default); *United States v. Jones*, 56 F.3d 62 (4th Cir. 1995) (same).  Allowing a defendant who agreed to waive his appellate rights to establish "cause" and simply file a § 2255 motion instead would "turn[] the 'cause requirement on its head.'" *United States v. Pipitone*, 67 F.3d 34, 39 (2d Cir. 1995).

their case. *See Bousley,* 523 U.S. at 622 ("Indeed, at the time of petitioner's plea, the Federal Reporters were replete with cases involving challenges to the notion that 'use' is synonymous with mere 'possession.'" (citations omitted)); *cf. Hammond,* 351 F. Supp. 3d at 124 (finding cause for challenge based on Supreme Court decision which overruled two Supreme Court rulings, and which "no one—the government, the judge, or the appellant—could reasonably have anticipated.") (quoting *United States v. Redrick*, 841 F.3d 478, 480 (D.C. Cir. 2016)).  The claim was reasonably available.

### 2.   The Defendants Fail to Raise a Substantial Claim Because They Cannot Establish Actual Innocence

Ochs and DeCarlo therefore cannot escape procedural default unless they make a threshold showing of "actual innocence". *Smith* v. *Murray*, 477 U.S. 527, 537 (1986). The "actual innocence" exception requires a defendant to show that it was "more likely than not that no reasonable juror would have convicted him" had the district court correctly instructed the jury and given the government the opportunity to adduce evidence of the omitted element. *Schlup* v. *Delo*, 513 U.S. 298, 327-328 (1995); *see also United States v. Baxter*, 761 F.3d 17, 31-32 (D.C. Cir. 2014) (defendant's bare-bones assertion not sufficient).

In addition, "[i]n cases where the Government has forgone more serious charges in the course of plea bargaining, petitioner's showing of actual innocence must also extend to those charges." *Bousley,* 523 U.S. at 624. The same showing is required for forgone charges of *equal* seriousness, and the charges need not have ever actually been brought. *United States v. Caso*, 723 F.3d 215, 219-21 (D.C. Cir. 2013) ("There is nothing strained about concluding that a prosecutor can forgo 'charges' either by dropping them after an indictment or by never bringing them at all.") (emphasis omitted). In the D.C. Circuit, courts measure the relative seriousness of a charge using the Sentencing Guidelines, not the statutory maximum. *Id.* at 225.

To rebut a claim of actual innocence, "the Government is not limited to the existing record." *Bousley,* 523 U.S. at 623–24 (also noting that court may consider "evidence [that] was not presented during petitioner's plea colloquy") (citation omitted); *see also Schlup*, 513 U.S. at 328 ("The habeas court must make its determination concerning the petitioner's innocence in light of all the evidence, including . . evidence tenably claimed to have been wrongly excluded or to have become available only after the trial."). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley,* 523 U.S. at 623.

### a.  The Defendants Do Not Raise a Substantial Claim Because They Do Not Show Actual Innocence of Forgone Charges

Ochs and DeCarlo, who claim they pled guilty merely because they were "physically present at the Capitol," ECF 112 at 5, minimize their conduct, and do not address their actual innocence of any other charges. Because several of those charges have equal or greater guidelines ranges, they thus fail to raise a substantial claim as to their actual innocence, and their petition fails. The government forwent at least three charges of equal or greater seriousness here, compared with the offense level of 22 that the Court calculated for the § 1512(c)(2) offense of conviction.[6] *See* ECF 89 ¶¶ 48-5, 91 ¶¶ 49-59 at (Final PSRs containing guidelines calculation, which the Court adopted).

### i.    18 U.S.C. § 111(b)

As relevant here, 18 U.S.C. § 111(b) criminalizes using a deadly or dangerous weapon in the course of forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with a federal officer. The defendants admitted they threw smoke bombs at the police. ECF 79 ¶ 12; ECF

---

[6] For the purposes of this brief, the government uses the offense level of 22 that the Court calculated for the § 1512(c)(2) offense at sentencing, notwithstanding the fact that the D.C. Circuit has since held that certain enhancements no longer apply.  *United States v. Brock,* 94 F.4th 39, 51 (D.C. Cir. 2024).

82 ¶ 13. That is an assault. They did this in the middle of an intense conflict between rioters and police on the Capitol's West Front, with rioters attacking police with chemical spray and metal rods, among other objects. ECF 94 at 15. In this context, the smoke bomb was a "deadly or dangerous weapon."

An object is a deadly or dangerous weapon if the object is capable of causing serious bodily injury or death to another person and the defendant used it in that manner. *United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002). While such injuries may not be common, smoke bombs are "capable" of causing acute lung injury (from smoke inhalation).[7]  Their capability to cause serious bodily injury is even greater in the context of the manner used here, where defendants

---

[7] *See, e.g.,* "A Case of Smoke Bomb-induced Acute Lung Injury," Intern Med. 2021 Mar 15; 60(6): 965–966; *available at* National Library of Medicine, National Center for Biotechnology Information, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8024971/; *see also* "Zinc chloride-induced TRPA1 activation does not contribute to toxicity in vitro," *Toxicology Letters,* 1 September 2018, *available at* https://www.sciencedirect.com/science/article/abs/pii/S0378427417313401?via%3Dihub ("A plethora of clinical respiratory symptoms including laryngeal, tracheal, and bronchial mucosal edema and ulceration, interstitial fibrosis, alveolar obliteration, interstitial edema, and bronchiolitis obliterans have been associated with inhalation of $ZnCl_2$ smoke"); "Inhalation lung injury induced by smoke bombs in children: CT manifestations, dynamic evolution features and quantitative analysis," J Thorac Dis. 2018 Oct; 10(10): 5860–5869, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6236165/#:~:text=Smoke%20bombs%20can%20release%20a,cause%20airway%20and%20lung%20injury. (noting studies finding various forms of lung injury and explaining that "Smoke bombs can release a mixed chemical smoke containing zinc chloride, zinc oxide, hexachloroethane and other chemical ingredients after flaring. Smoke inhaling can cause airway and lung injury."); "Pulmonary damage after modest exposure to zinc chloride smoke. *Respiratory Medicine.* 1999;93(12):885–890; *available at* https://pubmed.ncbi.nlm.nih.gov/10653050/ ("sometimes even a modest exposure to zinc chloride smoke can cause significant late and long-term decline in lung functions despite mild initial symptoms. A case series of thirteen soldiers exposed to zinc chloride smoke during a combat exercise showed a statistically significant decline in their lung diffusion capacity and total lung capacity of 16.2% and 4.3%, respectively, four weeks following the exposure.)
"Pulmonary function test findings in patients with acute inhalation injury caused by smoke bombs," Journal of Thoracic Disease, Vol 8, No 11 (November 16, 2016) (noting danger of "lung injury and even death"); *available at* https://jtd.amegroups.org/article/view/10602/html#:~:text=Some%20studies%20have%20suggested%20that,damage%20of%20the%20respiratory%20system..

threw the bombs at officers who were outnumbered and being actively attacked by a crowd of thousands. The smoke could obscure officers' vision, leaving them unable to see and defend themselves against objects being thrown or sprayed at them, or even rioters charging the police line.

The guidelines calculation for the violation of 18 U.S.C. § 111(b) would result in a total offense level of 23 (after acceptance) – higher than the level 22 of the defendants' offense. The offense level of 23 would be calculated as follows:

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.2(a)[8] | Base Offense Level | | 14 |
| U.S.S.G. § 2A2.2(b)(7) | § 111(b) conviction | +2 | |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous weapon | | +4 |
| U.S.S.G. § 3A1.2(a)-(b) | Official Victim | | +6 |
| U.S.S.G § 3E.1.1 | Acceptance of Responsibility | | -3 |
| **TOTAL** | | | 23 |

The violation of 18 U.S.C. § 111(b) forgone by the government is thus an offense of equal or greater seriousness that defeats defendants' actual innocence claim.

### ii.   18 U.S.C. § 372

The government also could have charged the defendants with violating 18 U.S.C. § 372, a charge the government brought against other members of the Proud Boys at the time that plea negotiations in this case were ongoing. Third Superseding Indictment, *United States v. Nordean,* 21-cr-175 (TJK), ECF 380 (D.D.C. June 6, 2022). Ochs and DeCarlo were charged with conspiracy (under 18 U.S.C. § 371), and fittingly so—all their actions were coordinated with each other, from their travel planning and simultaneous fundraisers to their shared accommodation; and, on January 6, they moved in lockstep, and they both filmed a video after celebrating how they had

---

[8] By cross-reference from U.S.S.G. § 2A2.4(c)(1), which directs that U.S.S.G. § 2A2.2 be applied if the conduct constituted aggravated assault (as, here, when it involved a dangerous weapon and intent to commit another felony, such as a violation of 18 U.S.C. § 231(a)(3) (civil disorder)).

"stopped the steal" and "did our job." When they threw the smoke bombs at the police, they did

so together, and discussed how to properly deploy them.

Their conduct establishes a violation of 18 U.S.C. § 372 under at least two theories. 18

U.S.C. § 372 provides:

> If two or more persons . . conspire to [(1)] prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof, or [(2)] to induce by like means any officer of the United States to leave the place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties, each of such persons shall be fined under this title or imprisoned not more than six years, or both.

*Id*.

DeCarlo and Ochs violated each clause of 18 U.S.C. § 372 as to both members of the

United States Congress and police officers defending the Capitol. *See United States v. Nordean,*

21-cr-175 (TJK), 2022 WL 17583799, at *11-*15 (D.D.C. Dec. 11, 2022) (denying motion to

dismiss charge under 18 U.S.C. § 372 and finding that members of Congress and U.S. Capitol

Police hold an "office, trust, or place of confidence under the United States").[9] As noted above,

they functioned as a unit on January 6. By working together to throw smoke bombs at the police,

storm the Capitol, point rioters toward Speaker Pelosi's office, and deface a door with their chilling

"Murder the Media" slogan, all in service of an effort to stop the certification proceeding, they

sought to "prevent, by force, intimidation or threat" both members of Congress and the police (the

direct victims of their smoke-bomb assault) from discharging their duties of certifying the vote

---

[9] A jury convicted all five defendants in the *Nordean* case (members of the Proud Boys) of violating 18 U.S.C. § 372 in connection with their conduct on January 6 under both theories (preventing a member of Congress or federal officer from discharging and duty and inducing a member of Congress or federal officer to leave the place where their duties were required to be performed).  Verdict Form, *United States v. Nordean,* 21-cr-175 (TJK), ECF 804, at 3-4 (D.D.C. May 4, 2023).

and defending the Capitol on January 6. Each of these were threatening, intimidating, or forcible, assaultive activities. They reflected the violence that Ochs had anticipated when he told other members of the Proud Boys, "I'll still chimp out if I'm wrong about the Supreme Court tho…we just have to TIME IT RIGHT and DO IT SMART." ECF 94 at 4-5.

The defendants' conspiracy also sought to injure officers or induce them to stop defending the Capitol. 18 U.S.C. § 372 ("to induce by like means any officer of the United States to leave the place, where his duties as an officer are required to be performed"). And they sought to induce members of Congress to leave the place where *their* duties were to be performed: they intended to stop Congress from certifying the election at the Capitol that day. Ochs summed it up as they left the Capitol: "we stormed the fuckin' U.S. Capitol and made Congress flee." ECF 94 at 31. DeCarlo flashed a thumbs-up sign. *Id.*

The guidelines for 18 U.S.C. § 372 are calculated identically to the guidelines for § 1512(c)(2) here. Because the conspiracy targeted members of Congress and the police in order to obstruct the certification, it uses the obstruction guideline, U.S.S.G. §2J1.2.[10]  *See United States*

---

[10] Under U.S.S.G. § 2X1.1, cmt. n.3, for a conspiracy conviction for which the substantive offense is not covered by a specific guideline, use § 2X5.1. Under § 2X5.1, since there is no applicable Chapter Two Guideline for an offense of preventing officers of the United States from discharging their duties in the Statutory Appendix, use "the most analogous guideline." The "officers" of the United States who were the victims of this count were the Members of Congress and law enforcement officers.  Because the object of the defendants' conspiracy—preventing Members of Congress from performing their constitutional duties at the Capitol on January 6—was designed to obstruct the administration of justice, the most analogous guideline is U.S.S.G. § 2J1.2, "Obstruction of Justice."  The victims of this effort—Members of Congress and the federal law enforcement who were protecting them—are indistinguishable for this purpose. Indeed, Judge Mehta applied §2J1.2 to violations of 18 U.S.C. § 372 by members of the Oath Keepers. *See United States v. Elmer Stewart Rhodes, et al.*, No. 22-cr-15 (APM). And the First Circuit agreed that §2J1.2, rather than §2A2.4, was the most analogous guideline for a defendant convicted of violating 18 U.S.C. § 372, when the defendant's conviction was premised on the defendant conspiring to prevent federal officers from arresting other people, and thus "obstructed the administration of justice." *United States v. Gerhard*, 615 F.3d 7, 33 (1st Cir. 2010); *see also United States v. Rakes*, 510 F.3d 1280, 1290 (10th Cir. 2007) (acknowledging that a § 372 conviction for

*v. Biggs,* 21-cr-175-2 (TJK), Aug. 31, 2023 Sent. Hrg. Tr. ("Biggs Sent. Tr.") at 13-15 (applying

§ 2J1.2 to violation of 18 U.S.C. § 372 where defendants, like Ochs and DeCarlo, sought to induce

Congress to leave their place of duty during the certification) (transcript separately provided); *see*

*also, e.g., United States v. Meggs,* 22-cr-15-2 (APM), May 25, 2023 Sent. Hrg. Tr. at 32 (same).[11]

Thus, 18 U.S.C. § 372 also qualifies as an equally serious offense under the guidelines, and Ochs

and DeCarlo have not established that no reasonable jury would find them guilty of violating the

statute.

### iii.   18 U.S.C. § 1361

Count Three of the Superseding Indictment charged Ochs and DeCarlo with violating 18

U.S.C. §§ 1361 and 2 (destruction of federal property and aiding and abetting) for defacing the

Memorial Door with "Murder the Media" graffiti. ECF 68 at 8. Ochs and DeCarlo admitted to this

conduct in their Statements of Offense, and the government dismissed Count Three at sentencing.

ECF 79 ¶ 18; ECF 82 ¶ 19; Dec. 9, 2022 Minute Entry. The defendants thus violated 18 U.S.C.

§ 1361, and the government forwent this charge.

The guidelines level for this 18 U.S.C. § 1361 violation is higher than a 22. While a

violation of 18 U.S.C. § 1361 usually references to U.S.S.G. §§ 2B1.1 or 2B1.5, here, the offense

level is calculated using U.S.S.G. § 3A1.4, because 18 U.S.C. § 1361 is an enumerated "federal

crime of terrorism." Under § 3A1.4, the offense level would thus be at least 32 (29 after

acceptance) – well above the level 22 of the offense of conviction.

Section 3A1.4 of the Guidelines applies where the offense was "a felony that involved, or

was intended to promote, a federal crime of terrorism" as that term is defined by 18 U.S.C.

---

conspiring to impede and thwart the prosecution of other people would constitute "imped[ing] the
due administration of the law," and thus would warrant application of §2J1.2 rather than §2A2.4).
[11] The transcript refers to Count Four, which was the conviction under 18 U.S.C. § 372.  *See*
Verdict Form, *United States v. Rhodes,* ECF 410 at 4-5.

§ 2332b(g)(5). That statutory definition, in turn, involves two requirements: (1) that the offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"; and (2) that the offense is one of the enumerated crimes listed in 18 U.S.C. § 2332b(g)(5)(B). 18 U.S.C. § 1361 is an enumerated crime listed in 18 U.S.C. § 2332b(g)(5)(B). As explained in the following paragraphs, defendants meet the first criteria as well. Consequently, § 3A1.4 would apply.

A defendant's offense is "calculated" to influence government or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct, as required by § 3A1.4, if the offense was specifically intended to have the effect of influencing, affecting, or retaliating against government by force or the threat of force. *See, e.g., United States v. Mohammed*, 693 F.3d 192, 201 (D.C. Cir. 2012) (defendant's narcoterrorism offense had requisite "calculation" where evidence showed defendant "specifically intend[ed] to use the commission from the drug sales to purchase a car to facilitate attacks against U.S. and foreign forces in Afghanistan"). While they are related, "calculation" for the § 3A1.4 enhancement is distinct from a defendant's particular "motive" and a defendant need not be "personally motivated by a desire to influence or affect the conduct of government," so long as the predicate crime was "calculated to have such an effect." *United States v. Khatallah*, 314 F. Supp. 3d 179, 199 (D.D.C. 2018). Although "calculation may often serve motive," the enhancement's "calculation" requirement is satisfied if a defendant's offense was "planned—for whatever reason or motive—to achieve the stated object." *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (§ 3A1.4 applied to defendant motivated by "prestige and potential influence obtained by associating with" another terrorist, even if defendant did not share the specific political motivation of that terrorist). A defendant's intent to influence government conduct or retaliate against the government need not

have been his "sole" or "primary" purpose and the "calculation" requirement may be satisfied even if a defendant's relevant conduct sought to "accomplish other goals simultaneously." *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018); *see also United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014) (defendant's "money-raising goals obviously do not preclude a finding of intent to influence government policy," even if raising money was defendant's "primary purpose").

The defendants' relevant conduct reflects their effort stop to Congress from certifying the 2020 Electoral College vote and to physically prevent Congress from performing its constitutional duty inside the Capitol building, all through the threatened and actual use of intimidation and force. The defendants have admitted they sought to stop the certification that day. The defendants have admitted they used force on January 6, throwing smoke bombs at the police. And whether or not the slogan they scrawled was simply the name of their online platform, they would have understood what it meant to write the words "Murder the Media" on the door to the Capitol, surrounded by so many who would have no reason to associate it with their fringe online presence. A defendant's specific intent to influence and retaliate against government conduct for purposes of § 3A1.4 can often "be inferred from the defendant's choice of target." *Khatallah*, 314 F. Supp. 3d at 198. Attacking a government facility that is "a physical manifestation of the U.S. government . . . suggests a desire to retaliate against or influence that government." *Id.* at 199. That is why, "[u]nsurprisingly . . . several courts have applied and upheld the terrorism enhancement for defendants who targeted government facilities." *Id.* (citing cases). Finally, their celebrations— from from their victory smoke in the Capitol to their gleeful recounting of having made "Congress flee"—can also be understood as attempts to intimidate, through ridicule, through a show of (thankfully temporary) dominion over the country's seat of government. In short, defendants' conduct displayed an intent to stop Congress from certifying the results of the election through the

use of intimidation, threats, physical force, and property destruction. That conduct demonstrates an intent to influence and retaliate against government conduct through intimidation or coercion that warrants the application of U.S.S.G. § 3A1.4. *See also Biggs* Sent. Tr. at 31-35 (applying § 3A1.4 to 18 U.S.C. § 1361 offense committed by Proud Boys member who helped destroy metal fence on the West Front);[12] *United States v. Pezzola,* 21-cr-175 (TJK), Sept. 1, 2023 Sent. Tr. at 40-45 (same, for defendant who broke window on January 6) (transcript separately provided).[13] The resulting offense level of 32 (29 after acceptance) is higher than the offense level of 25 (22 after acceptance) that the Court applied to the § 1512(c)(2) offense of conviction.

Thus, there are at least three charges of equal or greater seriousness that the government forwent in connection with the plea. Ochs and DeCarlo establish their actual innocence as to none of them. Their motion is barred.[14]

### b. The Defendants Do Not Raise a Substantial Claim Regarding Their Actual Innocence Under § 1512(c)(2)

The Court need not go further; the fact that Ochs and DeCarlo have failed to raise a substantial claim that no reasonable jury would convict them of violating 18 U.S.C. §§ 111(b), 372, and 1361 is enough to bar their motion. They also do not carry their burden to establish, on the full factual record, that it is evident that no reasonable jury would convict them of violating

---

[12] Judge Kelly applied the U.S.S.G. § 3A1.4 enhancement to all five defendants in *United States v. Nordean.*

[13] Judge Kelly also distinguished the § 3A1.4 enhancement (which applied in *Biggs* and *Pezzola* to the 18 U.S.C. § 1361 offenses and which applies here) to January 6 cases (not involving an enumerated federal crime of terrorism like 18 U.S.C. § 1361) where judges have considered whether to depart upward under a different provision, application note 4 to § 3A1.4. He noted that the question of the upward departure was "committed to the courts' discretion" – unlike the § 3A1.4 adjustment, which must be applied if a court finds that the facts warrant it. *See, e.g., Biggs* Sent. Tr. at 32-33.

[14] The government also forwent charges under 18 U.S.C. § 231(a)(3) (civil disorder). The fact that Ochs and DeCarlo faced all these additional felonies also underscores that they received a benefit from their plea bargain, and that that bargain should be enforced.

§ 1512(c)(2). They thus fail to raise a substantial claim as to their actual innocence under § 1512(c)(2) itself.

While the government has generally not contested that *Fischer* raises a "substantial question" under 18 U.S.C. § 3143(b) for motions seeking bail pending appeal, Ochs and DeCarlo are in a different posture. Their burden is higher, on two fronts. Release pending habeas review is rare, requiring a "clear, and readily evident, case on the facts." *Martin*, 801 F.2d at 329. Second, to establish actual innocence and overcome their procedural default, the defendants—not the government—will have to show that it is more likely than not that *no* reasonable jury (making reasonable inferences from the evidence) would convict them of violating § 1512(c)(2).

The defendants' showing is insufficient. They limit their analysis to the statement of offense (and even then, omit several facts), and "mere legal insufficiency," not the "factual innocence" *Bousley* requires, 523 U.S. at 623. There is no dispute that the Court did not ask Ochs and DeCarlo to address *Fischer*'s new "records, documents, objects, or other things" requirement at their plea colloquy. But that only goes so far. Just because a court does not apprise a defendant of a certain legal requirement does not mean that facts supporting the omitted requirement do not exist.

Here, the January 6 "official proceeding plainly used certain records, documents, or objects"—including, among others, those relating to the electoral votes themselves. *Fischer*, 144 S. Ct. at 2194 (Jackson, J., concurring). It "operate[d] through a deliberate and legally prescribed assessment of ballots, lists, certificates, and, potentially, written objections"; "Congress had before it boxes carried into the House chamber at the beginning of the Joint Session that contained 'certificates of votes from the electors of all 50 states plus the District of Columbia,'" U.S. Br. at 60, *United States v. Fischer et. al*, No. 22-3038 (D.C. Cir.) (filed Aug. 8, 2022); and (2) "as rioters

began to breach the restricted area around the Capitol building and grounds on January 6, 2021, legislators were evacuated from the House and Senate chambers, and the staff for the Secretary of the Senate 'took the ballot boxes and other paraphernalia of the proceeding" out of the chamber "to maintain custody of the ballots and make sure nothing happen[ed] to them." *Id.* (citing trial transcript). By causing or attempting to cause the electoral ballots to be removed from the Chamber to ensure their safety, Ochs and DeCarlo impaired (or attempted to impair) the availability of those electoral certificates for use in the certification proceeding set to take place on January 6.

The concurring opinion in *Fischer* emphasized that § 1512(c)(2) remains available to prosecute January 6 riot participants. "It might well be that Fischer's conduct, as alleged here, involved the impairment (or the attempted impairment) of the availability or integrity of things used during the January 6 proceeding. . . If so, then Fischer's prosecution under § 1512(c)(2) can, and should, proceed. That issue remains available for the lower courts to determine on remand." *Fischer*, 144 S. Ct. at 2194 (Jackson, J., concurring). Ochs and DeCarlo do not carry their burden to clearly show that *no* reasonable jury would convict these two politically aware individuals (who followed the election, knew about the certification, hosted political shows on social media, and who explicitly acknowledged that they caused the proceeding to stop by storming the building), who sought to stop the certification, of engaging in conduct whose natural, probable, and actual consequence was to impair the availability of records, documents, objects, or other things—namely, the electoral certificates for President-Elect Biden that they did not want Congress to validate that day. A jury could infer the defendants' intent vis-à-vis the certificates or other documents relating to the proceeding from evidence (including evidence of defendants' knowledge of election challenges and the certification process) that these defendants understood that the natural and logical consequence of attacking the officers and storming the Capitol would be to

make the certificates unavailable to lawmakers, impairing their availability for use in the proceeding.

*Fischer* does not affect every January 6 case in every posture identically. Under the "heightened standard" that applies to motions seeking release pending adjudication of a habeas petition, *Kelly,* 790 F.2d at 139 (citation omitted), and on the evidence specific to these defendants, Ochs and DeCarlo do not present a "clear, and readily evident, case on the facts" that no reasonable jury could convict them. *Martin*, 801 F.2d at 329. They fail to meet the standard for bail pending habeas review.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny the defendants' request for release pending adjudication of their habeas petition.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

BY:  */s/ Alexis J. Loeb*
Alexis J. Loeb
Assistant United States Attorney
(Detailed)
CA Bar No. 269895
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
415-436-7200
Alexis.loeb@usdoj.gov