# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-73 (BAH)** |
| **v.** | : | |
| | : | |
| **NICHOLAS DECARLO and** | : | |
| **NICHOLAS OCHS,** | : | |
| | : | |
| **Defendants.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION TO VACATE THEIR CONVICTIONS UNDER 28 U.S.C. § 2255

The United States of America, by and through its undersigned attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendants Nicholas DeCarlo and Nicholas Ochs' motion to vacate their convictions under 28 U.S.C. § 2255 ("§ 2255"). This brief largely reiterates the arguments in the government's previously filed opposition to defendants' request for relief pending adjudication of this motion (ECF 117), while reflecting the legal standard applicable in this posture, expanding some portions of the factual discussion, responding to points raised in defendants' latest filing (ECF 118), and incorporating the Court's ruling denying defendants' request for release (ECF 120).  The government also withdraws its earlier argument that the defendants' motion fails because they cannot establish their actual innocence under 18 U.S.C. § 1361 (because the defendants committed only a misdemeanor violation of that statute)—although maintains that defendants have failed to carry their burden to establish actual innocence under 18 U.S.C. §§ 111(b), 372, or the offense of conviction, 18 U.S.C. § 1512(c)(2) ("§ 1512(c)(2)").

Ochs, a senior Proud Boys leader, and DeCarlo, a former high-ranking Proud Boys member, assaulted officers with smoke bombs, defaced the Capitol with graffiti declaring "Murder the Media," and stole a pair of flex cuffs. They enjoyed a smoke in the Crypt, waved rioters toward

Speaker Pelosi's office—precipitating a violent confrontation with police—and filmed a self-congratulatory video where they celebrated stopping Congress's certification proceeding "when we stormed the Capitol." They planned their trip together, prepared for violence, moved together throughout the day, coordinated with other Proud Boys, and celebrated together after.

Ochs and DeCarlo each pled guilty to a single violation of 18 U.S.C. § 1512(c)(2) pursuant to a plea agreement in which they admitted to committing all these acts and to intentionally obstructing the certification of the Electoral College vote. In their plea agreements, the government dismissed and agreed not to bring other charges against them, and the defendants agreed not to appeal and not to collaterally attack their convictions.

They now seek to set aside that bargain and wipe their slates clean because the Supreme Court narrowed the meaning of § 1512(c)(2) in *Fischer v. United States,* 603 U.S. ___, 144 S. Ct. 2176, 2024 WL 3208034 (June 28, 2024). But in their plea agreements, they unambiguously waived their right to file a § 2255 motion. At the time, legal challenges to § 1512(c)(2) were ongoing, and the defendants had filed one such challenge themselves. In exchange for their guilty plea to a single count, the government dismissed or did not bring several other charges of equal or greater seriousness against them. That was the bargain these defendants struck: they chose to limit their exposure and obtain finality rather than continue to press their case. Courts, including the D.C. Circuit, have declined to undo such waivers based on arguments that the law later changed or that the district court got the law wrong. They have recognized that enforcing such waivers benefits both parties by allowing defendants to use their appellate and collateral review rights as leverage and receive benefits in exchange. This Court should do the same.

Even if the defendants could set aside their waivers, they still cannot prevail. Their § 2255 motion is procedurally defaulted (they filed no direct appeal and cannot establish cause), and they

2

do not make the actual innocence showing required to overcome their default. This is so for two independently sufficient reasons. First, the government forwent equally or more serious charges against them in connection with the plea, such as assault charges for the smoke bombs they admitted they threw. While the Court can stop there, these defendants also do not meet their burden to show, based on all the evidence, that they are factually innocent under the post-*Fischer* § 1512(c)(2) standard: that there is *no* reasonable juror who would convict them of taking or attempting to take some action to make a record, document, or other object (such as the electoral vote certificates) unavailable or impair their integrity. The Court should reject the defendants' motion.

## BACKGROUND

### I. The Defendants' Conduct on January 6

The defendants' statements of offense and the government's sentencing memoranda describe the defendants' conduct on January 6—which this Court has characterized as "egregious," ECF 120 at 1—and the government incorporates them by reference. *See* ECF 79 (DeCarlo Statement of Offense); 82 (Ochs Statement of Offense);[1] 93 (Gov't Sent. Mem. as to DeCarlo) ("DeCarlo Sent. Mem"); 94 (Gov't Sent. Mem. as to Ochs) ("Ochs Sent. Mem."); 101 (Gov't Reply Sent. Mem. as to DeCarlo).

Ochs was an Elder, a member of the Proud Boys' senior leadership counsel; DeCarlo was a former third-degree Proud Boys member. ECF 82 ¶ 8. Ochs and DeCarlo ran a social media platform called "Murder the Media," which they used to offer political and social commentary.

---

[1] Ochs and DeCarlo's Statements of Offense are nearly identical except for two paragraphs providing some background information regarding each defendant and his travel to Washington, D.C. (ECF 79 ¶ 8; ECF 82 ¶¶ 8-9). Each sentencing memorandum also contains substantial overlapping information regarding the defendants' joint conduct; the government generally does not cite both sentencing memoranda for common points.

*Id.* ¶ 19. Ochs had previously run for Hawaii's House of Representatives, garnering Roger Stone's endorsement. CNN, *Insurrection fueled by conspiracy groups, extremists, and fringe movements;* January 7, 2021, *available at* https://www.cnn.com/2021/01/07/us/insurrection-capitol-extremist-groups-invs/index.html (interview of Ochs). They both referred to themselves as political journalists. *Id.; see also* https://gogetfunding.com/nick-decarlo-defense-fund/ (DeCarlo defense fundraiser describing him as a "reporter, journalist, and show host").

Ochs and DeCarlo planned to travel to Washington, D.C. for January 6 and, in various communications on social media, expressed their belief that the election had been stolen and prepared for violence. ECF 82 ¶ 9; ECF 93 at 3-4; ECF 94 at 3-11. Ochs also coordinated with other members of the Proud Boys, at one point commenting that he and Ethan Nordean would be senior leadership on the ground after Proud Boys chairman Enrique Tarrio was arrested. ECF 94 at 9.

Ochs also made predictions about how the Supreme Court would address election-related challenges. *Id.* at 6-7. In a twelve-person chat with other Proud Boys leaders, on November 7, 2020, the group reacted to Biden being declared the winner of the election, forecasting civil war. *Id.* at 4. Ochs explained, "Bush/gore ruling took till December…Trump has a MUCH stronger case." *Id.* at 4. Ochs said, "Americans are weak and don't want to fight. Them more so than us, but what's really going to matter to the common man is what the Supreme Court says. And it will say." *Id.* He reassured the others: "The odds are with us because of the Supreme Court boys. I'm pro violence but don't blow your load too soon." *Id.* After another member referred to the appointment of Justice Barrett, Ochs again discussed on the Supreme Court's potential role in deciding the election, while, at the same time, vowing violence if he was wrong: "Don't fuck up the ruling. It's a better chance than fighting…I'll still chimp out if I'm wrong about the Supreme

4

Court tho…we just have to TIME IT RIGHT and DO IT SMART." *Id.* at 5. He also noted in the "Skull and Bones" chat that "Justice Alito already making demands in Pennsylvania" and speculated how Chief Justice Roberts might vote. He commented, "Getting the state legislatures to pick our Electors takes balls that most Americans don't have," and noted that Senator Romney was supporting Biden. On Parler, Ochs recalled the 2016 election and posted a meme of Justice Thomas. *Id.* at 5-6. The day that President Trump called his supporters to D.C. for January 6, Ochs and other Proud Boys leaders discussed arranging a conference call. *Id.* at 7.

Ochs and DeCarlo stayed together at a hotel on January 5 and, after attending President Trump's rally, went to the Capitol the following day together, filming throughout. *See, e.g.,* ECF 79 at ¶¶ 8-18. As they drove to the Capitol, Ochs asked, "It'll be like 3 in the afternoon when Mike Pence fails?"  ECF 94 at 11. DeCarlo also said, "Mike Pence is going to fail." ECF 74 Ex. 1 at 1:01. At the Capitol, they laughed as they encountered downed fencing and violence on the West Plaza. ECF 94 at 12-13. As the battle between rioters and police intensified, they joined in, discussing how to deploy smoke grenades before launching them at the police. ECF 94 at 15-19; ECF 79 ¶ 12; ECF 82 ¶ 13. After throwing his, DeCarlo exclaimed, ""Oh fuck, I just threw it without pulling the pin. God damn it." ECF 94 at 16. He then told Ochs, "yeah, pull the pin and throw it." ECF 74 Ex. 13 at 0:31-0:34. Ochs did so. ECF 82 ¶ 13; ECF 94 at 15-19. Filming the huge crowd, DeCarlo asked, "Do you think they are scared in there?" ECF 94 at 29. Ochs replied, "Yeah, and I fucking love it!" *Id.*

Within ten minutes of the initial breach, they entered the Capitol. ECF 79 ¶ 13; ECF 82 ¶ 14; After yelling "where's Nancy?" in a singsong voice, they posed for pictures with celebratory cigarettes in the Crypt. ECF 79 ¶ 14; ECF 82 ¶ 15; ECF 94 at 21-23. They encouraged and recorded as rioters forced open a metal door that police had tried to close to seal off access to the Visitors'

Center, which contained tunnels leading to other parts of the Capitol. ECF 79 ¶ 15; ECF 82 ¶ 16; ECF 94 at 23. After reuniting with other Proud Boys, they entered the Rotunda, where they pointed rioters toward Speaker Pelosi's office. ECF 79 ¶ 16-17; ECF 82 ¶ 17-18; ECF 94 at 26-27. A crowd soon formed and rushed at the police line guarding the area. ECF 94 at 27.

When they left the Capitol Building at 3:00 p.m., their criminal activity did not stop. ECF 79 ¶ 17; ECF 82 ¶ 18; ECF 94 at 28. They wrote "Murder the Media" with a thick pen on the Memorial Door of the Capitol. ECF 79 ¶ 18; ECF 82 ¶ 19; ECF 94 at 28-30. DeCarlo stole a pair of flex cuffs from a Capitol Police bag. ECF 79 ¶ 19; ECF 82 ¶ 20. As they walked away from the Capitol that day, Ochs said, "sorry we couldn't go live when we stormed the fuckin' U.S. Capitol and made Congress flee," and DeCarlo laughed and flashed a thumbs-up sign. ECF 79 ¶ 20; ECF 82 ¶ 22. And later that day, they filmed themselves reacting to the headline that "Congress stopped the vote when we stormed the Capitol." ECF 79 ¶ 21; ECF 82 ¶ 23. Their reaction: "as we've been saying all day, we came here to stop the steal. Ochs said, "It may resume, but the steal is for now stopped. You're welcome, America!" to which DeCarlo replied "we did our job. We did our job." *Id.* DeCarlo later gave multiple interviews recounting what he had seen, celebrating what had happened, minimizing his own conduct, and complaining about Vice President Pence and "half of the Republicans" who were "not there for us." ECF 93 at 22-30; ECF 101 at 1-2.

## II. Procedural Background

The defendants were arrested in January 2021 and charged by indictment the next month with conspiracy, in violation of 18 U.S.C. § 371 (with a § 1512(c)(2) object), obstruction of an official proceeding, in violation of § 1512(c)(2), and five misdemeanor charges. ECF 17. DeCarlo moved to dismiss the § 1512(c)(2) charge and the conspiracy charge. ECF 12. Ochs joined the motion. ECF 56. The Court denied the motion. Jan. 21, 2022 Minute Entry. At the time, the

6

application of § 1512(c)(2) to January 6 defendants was being heavily litigated across the district, with multiple rounds of briefing in some cases and several district courts issuing lengthy opinions. *See, e.g., United States v. Montgomery*, 578 F. Supp. 3d 54, 59 (D.D.C. 2021); *United States v. Caldwell*, 581 F. Supp. 3d 1, 7 (D.D.C. 2021). In March, 2022, in decisions that became the subject of the Supreme Court litigation that gave rise to defendants' motion, Judge Nichols agreed with arguments being raised by January 6 defendants, dismissed rioters' § 1512(c)(2) charges, and denied motions for reconsideration. *See United States v. Miller*, 589 F. Supp. 3d 60, 63 (D.D.C.), *reconsideration denied*, 605 F. Supp. 3d 63 (D.D.C. 2022), and *rev'd and remanded sub nom. United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023), *cert. granted*, 144 S. Ct. 537 (2023), and *vacated and remanded*, 144 S. Ct. 2176 (2024), and *cert. granted, judgment vacated sub nom. Miller v. United States*, No. 23-94, 2024 WL 3259658 (U.S. July 2, 2024), and *cert. granted, judgment vacated sub nom. Lang v. United States*, No. 23-32, 2024 WL 3259659 (U.S. July 2, 2024); *United States v. Fischer*, No. 1:21-CR-00234 (CJN), 2022 WL 782413, at *1 (D.D.C. Mar. 15, 2022), *rev'd and remanded*, 64 F.4th 329 (D.C. Cir. 2023), *cert. granted*, 144 S. Ct. 537 (2023), and *vacated and remanded*, 144 S. Ct. 2176 (2024).

In this case, the grand jury returned a superseding indictment on February 18, 2022, that removed a misdemeanor charge under 18 U.S.C. § 1752(a)(4). ECF 68. The Court set trial for November 15, 2022, with pretrial motions due September 15. Feb. 23, 2022 Minute Order.

## A. Evidence of Additional Felony Conduct, Guilty Pleas, Waiver, and Sentencing

The government began preparing for trial and, on May 12 and 13, 2022, disclosed videos showing the defendants throwing objects at the police during the violent confrontation on the Capitol's West Front and discussing needing to "pull the pin" first. ECF 74 Ex. 13. The

government explained that these videos were evidence of additional felony conduct by the defendants, and plea negotiations began.

The parties proceeded to negotiate an agreement in which the defendants agreed to plead guilty to a violation of § 1512(c)(2), and the government agreed to dismiss the remaining charges and not bring additional charges for the conduct described in the statement of offense (which included defendants' admission that they threw smoke bombs at police). Plea Agreement, ECF 77 (DeCarlo Plea Agreement), 81 (Ochs Plea Agreement) at ¶¶ 1 (agreements to plead guilty), 4 (agreements not to further prosecute); ECF 79 ¶ 12; ECF 82 ¶ 13 (smoke bomb admissions). Each also admitted that he "attempted to or did obstruct or impede an official proceeding," that he "intended to obstruct or impede the official proceeding," and that he acted "knowingly, with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding," and that he acted "corruptly." ECF 79 ¶ 22; ECF 82 ¶ 24. The parties calculated the offense level at 22 after credit for acceptance of responsibility. ECF 77, 81 ¶ 5(A). Along with the plea agreement, the government submitted over 30 video exhibits supporting defendants' statements of offense. ECF 74.

The plea agreements also included the following collateral attack waiver:

> Your client also waives any right to challenge the conviction entered or sentence imposed under this Agreement or otherwise attempt to modify or change the sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under 28 U.S.C. § 2255 or Federal Rule of Civil Procedure 60(b), except to the extent such a motion is based on newly discovered evidence or on a claim that your client received ineffective assistance of counsel. Your client reserves the right to file a motion brought under 18 U.S.C. § 3582(c)(2).

ECF 77 ¶ 10(D), 81 ¶ 10(D). Each defendant signed the plea agreement and the statement of offense. ECF 77 at 11, ECF 79 at 8, ECF 81 at 11, ECF 82 at 8. On September 9, 2022, the Court conducted a colloquy with each defendant under oath and accepted defendants' guilty pleas. Sept.

9, 2022 Minute Entry; Plea Colloquy Tr. at 18:17–19:16, 27:11–27:24, Sept. 9, 2022, ECF 116. During the colloquy, both defendants confirmed that they understood the collateral attack waivers. *Id.* at 16:11-17:8.

On December 9, 2022, the Court found that both defendants were in Criminal History Category I and calculated a total offense level of 22, consistent with the parties' plea agreements. Sentencing Tr. at 9:20–10:12, Dec. 9, 2022, ECF No. 110 at 9:14–19, 10:8–12. The Court sentenced the defendants to serve 48 months' imprisonment, within their 41-51 month guidelines range. *Id.* at 71:11–18, 76:4–10. The government dismissed the remaining counts of the Superseding Indictment. Dec. 9, 2022 Minute Entry. Judgments issued the same day. ECF 106, 108. Neither defendant filed an appeal.

According to the Bureau of Prisons' website (https://www.bop.gov/inmateloc/), DeCarlo's current release date is October 9, 2025, and Ochs' current release date is October 20, 2025.

**B. *Fischer v. United States***

On June 28, 2024, the Supreme Court issued its decision in *Fischer,* narrowing § 1512(c)(2)'s application. It held that § 1512(c) does not cover "all means of obstructing, influencing, or impeding any official proceeding." 144 S. Ct. at 2185. However, the Court did not reject the application of § 1512(c)(2) to January 6 prosecutions across the board. Rather, the Court explained that the government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or other things used in the proceeding – such as witness testimony or intangible information—or attempted to do so. *Id.* at 2186, 2190. It remanded the case to the D.C. Circuit for further proceedings. *Id.* Since that time, the government has endeavored to evaluate cases impacted by *Fischer*, including cases where dismissal/vacatur is warranted as well as cases where trial/retrial on the charge is appropriate.

On July 9, 2024, the defendants moved to vacate their convictions under 28 U.S.C. § 2255, citing *Fischer.* ECF 112.  Their motion included a request for immediate release, which this Court rejected, finding that they had demonstrated neither a substantial claim nor exceptional circumstances.  ECF 120.

## LEGAL STANDARD

A defendant may move to vacate a sentence if he believes the sentence was imposed "in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. The relief contemplated by § 2255 "does not encompass all claimed errors in conviction and sentencing." *United States v. Addonizio*, 442 U.S. 178, 185 (1979). "Because of the premium placed on the finality of judgments, there are limited circumstances under which a court should grant a Section 2255 motion." *Bedewi v. United States*, 583 F. Supp. 2d 72, 76 (D.D.C. 2008) (internal quotation marks omitted).

A defendant bears the burden of demonstrating that he is entitled to relief under § 2255. *See, e.g., United States v. Wright,* 63 F. Supp. 3d 109, 115 (D.D.C. 2014); *United States v. Bell*, 65 F. Supp. 3d 229, 231 (D.D.C. 2014); *In re Moore*, 830 F.3d 1268, 1272 (11th Cir. 2016) (per curiam) (collecting cases); *Stanley v. United States*, 827 F.3d 562, 566 (7th Cir. 2016). It is "well-settled" that "to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982); *see also United States v. Pollard*, 959 F.2d 1011, 1020 (D.C. Cir. 1992). A judgment challenged on collateral attack carries with it a "presumption of regularity," "even when the question is waiver of constitutional rights." *Daniels v. United States*, 532 U.S. 374, 381 (2001) (internal quotation marks omitted).

**ARGUMENT**

Ignoring the fact that they admitted to throwing smoke bombs at the police (not to mention defacing the Capitol and stealing property), Ochs and DeCarlo claim they "pled guilty because they were physically present in the Capitol." ECF 112 at 5. Their misleading depiction of this case obscures the fact that Ochs and DeCarlo made a bargain—a bargain from which they benefited, which allowed them to plead guilty to a single felony count, where the government dismissed several charges in connection with the guilty plea and could have brought multiple other charges against them. The defendants reached this bargain at a time when they D.C. Circuit and the Supreme Court had not yet decided the scope of § 1512(c)(2), a statute they themselves had challenged. Through their plea bargain—which they now wish to set aside—the parties allocated the risk of the unknown: future charges by the government, and future developments in the law, such as occurred with *Fischer*. The defendants unambiguously gave up the right to bring a collateral attack, and the Court should enforce the parties' bargain, as courts have done in similar circumstances where a defendant tries to invalidate a plea by claiming the court informed him of statutory requirements incorrectly because the law subsequently changed in his favor. On this basis alone, the Court should deny defendants' motion.

Even if the Court declines to enforce the waiver, it should still deny defendants' motion. Defendants have no cause to excuse their procedural default, so they must establish "actual innocence" under *Bousley v. United States,* 523 U.S. 614, (1998) to prevail. They cannot. The government forwent several charges of equal or greater seriousness in connection with the plea, and the defendants fail to establish that not a single reasonable juror would convict them of those charges. This too is reason enough to deny the request for release. And while the Court need not reach the question of defendants' innocence under *Fischer* at this juncture—because of all the

other sufficient reasons to deny their request for release—defendants also do not establish on the full factual record that no reasonable juror would convict them of violating § 1512(c)(2).[2]

The government agrees that *Fischer* applies retroactively on collateral review and that defendants' motion is timely under 28 U.S.C. § 2255(f)(3). But because defendants waived their right to collaterally attack their convictions, have procedurally defaulted, and cannot overcome their procedural default by establishing actual innocence, their motion fails.

### A. The Defendants Waived the Right to Bring This Motion

This Court found that the "defendants have fallen short of showing that their § 2255 motion presents a threshold substantial question of law to satisfy the requirements for release pending resolution of their § 2255 motion" because of the plea agreements' waiver provision. ECF 120 at 12. Having failed to raise even a "substantial question," their claim fails on the merits as well. The defendants waived the right to bring this motion through unambiguous language in their plea agreements:

> Your client also waives any right to challenge the conviction entered or sentence imposed under this Agreement or otherwise attempt to modify or change the sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under 28 U.S.C. § 2255 or Federal Rule of Civil Procedure 60(b), except to the extent such a motion is based on newly discovered evidence or on a claim that your client received ineffective assistance of counsel. Your client reserves the right to file a motion brought under 18 U.S.C. § 3582(c)(2).

ECF 77 ¶ 10(D), 81 ¶ 10(D). The defendants' motion is based on *Fischer,* not newly discovered evidence, nor does it claim ineffective assistance of counsel or seek relief under 18 U.S.C. § 3582(c). By the plain language of the plea agreement, the defendants have waived the right to

---

[2] Should the Court reach the question of actual innocence and proceed to find that the defendants are actually innocent of all charges of equal or greater seriousness and § 1512(c)(2), the government would concede that their motion establishes a claim to relief as to their plea agreement only. The indictment, which "echoes the operative statutory text while also specifying the time and place of the offense." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018), is sufficient.

bring this motion. *See United States v. Stottlemyer*, No. 21-cr-334-2 (TJK), 2024 WL 1076852 (D.D.C. Mar. 8, 2024) (finding that an appeal that a defendant's admitted conduct did not fall within the scope of *Fischer* would be barred by appeal waiver in plea agreement).

Criminal defendants may waive constitutional and statutory rights as long as the waiver is knowing and voluntary. *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995). *See, e.g., Ricketts v. Adamson*, 483 U.S. 1, 9-10 (1987) (waiver of right to raise double-jeopardy defense); *Town of Newton v. Rumery*, 480 U.S. 386, 389, 398 (1987) (waiver of right to file constitutional tort action). This includes waivers of the right to appeal, even if anticipatory. *United States v. Powers*, 885 F.3d 728, 731 (D.C. Cir. 2018); *United States v. Hunt*, 843 F.3d 1022, 1027 (D.C. Cir. 2016).

As this Court put it, "courts enforce waivers in plea agreements if (1) the waivers are valid, and (2) the scope of the waiver covers the appeal or collateral attack defendants seek to advance." ECF 120 (citing *Hunt*, 843 F.3d at 1027 (D.C. Cir. 2016); *United States v. Koontz*, No. 16-cr-16 (EGS), 2024 WL 3225980, at *5–*6 (D.D.C. June 28, 2024)). The language of a collateral waiver in a plea agreement is interpreted as a contract and will "preclude[] challenges that fall within its scope" if it is knowing and voluntary and thus enforceable. *Garza v. Idaho*, 139 S. Ct. 738, 744-745 (2019).

The D.C. Circuit has affirmed the enforcement of appellate waivers. "The basic principle behind an appeal waiver is that the defendant *gives up* his right to have an appellate court review the merits of his arguments in exchange for valuable consideration." *Khadr v. United States,* 67 F. 4th 413, 424 (D.C. Cir. 2023), *cert. denied*, No. 23-720, 2024 WL 2262403 (U.S. May 20, 2024). "Allowing the defendant to waive this right . . . improves the defendant's bargaining position and increases the probability he will reach a satisfactory plea agreement with the Government." *United States v. Guillen*, 561 F.3d 527, 530 (D.C. Cir. 2009). So too with collateral waivers. *See, e.g.,*

*Koontz*, 2024 WL 3225980, at *6 (citing *Guillen* and declining to issue a certificate of appealability as to claims in § 2255 motion barred by collateral-attack waiver in plea agreement). In denying defendants' request for release, the Court recognized that "if defendants validly waived the right to file a § 2255 motion, judicial review of their substantive arguments for vacatur of their felony obstruction convictions and sentences would be improper." ECF 120 at 10 (*citing Khadr*, 67 F.4th at 418–19; *United States v. Ortega-Hernandez*, 804 F.3d 447, 451 (D.C. Cir. 2015); *In re Sealed Case*, 40 F.4th 605, 607–09 (D.C. Cir. 2022)).

Moreover, "[t]he principle that future changes in law do not vitiate collateral-challenge waivers is mainstream." *Portis v. United States*, 33 F.4th 331, 335 (6th Cir. 2022). Other circuits have accordingly affirmed the enforcement of collateral-attack waivers in similar circumstances, rejecting defendants' arguments that a later Supreme Court decision voids their plea agreement because they are allegedly no longer guilty of the offense to which they pled. As the Sixth Circuit has explained: "Subsequent developments in the law that would make a right to bring a postconviction challenge more valuable do not suddenly make the plea involuntary or unknowing or otherwise undo its binding nature." *Id.* (citation omitted). Thus, "waivers of the right to bring postconviction challenges remain enforceable after changes in law." *Id.*

As this Court recognized, for example, after the Supreme Court limited what crimes qualify as crimes of violence under 18 U.S.C. § 924(c) in *United States v. Davis*, 588 U.S. 445 (2019), "numerous defendants who had pled guilty under the old interpretation of § 924(c) sought to have their sentences vacated despite collateral attack waivers contained in their plea agreements." ECF 120 at 13 (citing cases). Like Ochs and DeCarlo, they argued that they had been convicted of an act the law no longer made criminal, and that courts should set aside their plea agreements' collateral-attack waivers and allow them to file § 2255 challenges. Several circuits, however,

14

recognized that enforceability of a collateral attack *waiver* is a separate question from the validity of the *conviction*: "the enforceability of a collateral-attack waiver turns on whether the prisoner's agreement *to the waiver* was knowing and voluntary, not whether the underlying conviction itself no longer appears valid after a change in law." *Portis,* 33 F.4th at 337. Rejecting one such claim, the Sixth Circuit observed that collateral waivers would "lose all effect" if they could be set aside simply by challenging the validity of underlying conviction. *Id.* (citation omitted).[3] "In the short term, that might seem helpful to criminal defendants. But in the long term, it would eliminate a bargaining tool to convince the government to drop pending charges against a defendant." *Id.* at 336. Because the defendants expressly waived their rights to bring collateral challenges, and because the waiver was knowing and voluntary, despite a change in the law undermining their convictions, the waivers were enforceable. *Id.*

The Second Circuit has likewise rejected a claim that defendants' pleas and collateral attack waivers were invalid after a change in law because they had a "due process right not to be convicted of a non-existent offense." *Cook v. United States*, 84 F.4th 118, 125 (2d Cir. 2023). *Cook,* like *Portis,* also involved defendants who pled guilty to violating 18 U.S.C. § 924(c) (and conspiracy to commit Hobbs Act robbery), waived their rights to appeal and collaterally attack their convictions, and then, after *Davis,* filed § 2255 motions to set aside their convictions. The Second Circuit enforced the collateral-attack waiver, finding that "the enforceability of a collateral-attack waiver turns on whether the petitioner's plea was knowing and voluntary, not the nature of any

---

[3] The Sixth Circuit also distinguished *Bousley,* where the defendant had *not* waived the right to collaterally attack his conviction. It found that "a future defendant may do what Bousley did not, namely agree to waive collateral attacks on his conviction no matter what future developments in the law bring." *Id.* "The [*Bousley*] Court held only that the guilty plea in that case was unknowing, not that a collateral-attack waiver would be unknowing or unenforceable. It is one thing to knowingly plead guilty to the elements of a crime; it is quite another to knowingly waive collateral challenges to a conviction." *Id.* at 338. Here, like in *Portis* and unlike in *Bousley*, there is an express waiver of collateral attacks.

subsequent legal developments." *Id.* at 124. Addressing the argument that defendants had a due-process right not to be convicted of a nonexistent offense, the Second Circuit reframed the question: "the question is not whether Petitioners have a right not to be convicted of a non-existent offense. It is whether Petitioners have a right to bring a collateral attack when, in exchange for valid consideration, they executed binding plea agreements admitting their criminal conduct and waiving their ability to challenge the resulting convictions." *Id.* at 125. In summary, "a waiver of the right to bring a postconviction challenge is presumptively enforceable, even after the legal landscape shifts." *Id.*

The Ninth Circuit has also agreed that a "change in the law does not make a plea involuntary and unknowing." In *United States v. Goodall*, 21 F.4th 555, 562–64 (9th Cir. 2021)), *cert. denied*, 142 S. Ct. 2666 (2022), the defendant, who had pled guilty and waived the right to appeal, also argued his appellate waiver and plea were no longer enforceable after *Johnson* and *Davis*. *Goodall* rejected the claim that the defendant had not foreseen a change in the law when he waived his appellate rights. *Id.* at 562. "When a defendant waives his appellate rights, he knows that he is giving up all appeals, no matter what unforeseen events may happen." *Id.* And, in *Goodall,* the defendant received benefits from his plea, just as Ochs and DeCarlo did here: "the government dropped one § 924(c) count (which reduced the mandatory minimum sentence by 25 years) and agreed to recommend a 240-month sentence. When Goodall agreed to this plea agreement, he apparently believed that it was a good deal for him. Just because Goodall's choice looks less favorable with the benefit of hindsight does not make the choice involuntary." *Id.* (citation omitted). "A plea agreement is no different in this respect from any other contract in which someone may have buyer's remorse after an unforeseen future event—the contract remains valid because the parties knowingly and voluntarily agreed to the terms." *Id.*

16

Simply put, "[t]here is no do-over just because a defendant later regrets agreeing to a plea deal." *Id*.; *see also Oliver v. United States*, 951 F.3d 841 (7th Cir. 2020) ("One major purpose of an express waiver is to account in advance for unpredicted future developments in the law."). As the Seventh Circuit, also enforcing a collateral-attack waiver after a change in law undermined a defendant's conviction, asked: "If a defendant can make a seemingly beneficial plea agreement and can then renege on his deal and maintain an appeal, then why would the government make these kinds of deals in the future? Why wouldn't the government instead just charge defendants with all applicable crimes and see what sticks after the appeal?" *Oliver,* 951 F.3d at 845 (citation omitted). If defendants could always void a waiver based on some change in the law, collateral waivers would lose much of their value.

The D.C. Circuit's decision in *Khadr,* 67 F. 4th at 424, enforcing an appellate waiver, suggests that it would follow the same course here. Khadr argued that his military-commission plea was not knowingly made because the military judge had erroneously "ruled against him on the merits of his legal claims" and thereby "misinformed him about the nature and constitutionality of the charges against him." *Id.* Khadr's position resembles Ochs' and DeCarlo's argument that the Court misinformed them of the elements of § 1512(c)(2) and that their pleas are thus invalid. ECF 112 at 5. The D.C. Circuit rejected this argument, calling it "too clever by half." *Id.* at 424. The panel explained that Khadr could not "challenge [his] plea based on an alleged error of law that was raised, rejected[,] and then waived pursuant to the plea" where petitioner was "aware that the military judge had rejected his theories" yet "nonetheless chose to plead guilty and expressly waive his right to appeal those erroneous (in his view) rulings." *Id.* The same logic applies here. Ochs and DeCarlo "cannot now have the merits of [their] waived claims reviewed on appeal by arguing [their] waiver was invalid because those claims were wrongly decided." *Id.* As this Court

found, defendants have "raise[d] little argument at this procedural juncture, let alone a basis, given the significant weight of decisions supporting the enforceability of appeal and collateral attack waivers, to find this question is even sufficiently close…to raise a substantial legal question"—let alone to overcome these decisions and support setting aside the waiver entirely, as they must in this posture. ECF 120 at 12.

The defendants' reply in support of their request for release did not address the substantial authority supporting enforcement of the waiver here. Instead, they argued that the government agreed to release another January 6 defendant, Jorge Riley, 21-cr-69 (APM), whose plea agreement contained a similar waiver. ECF 113 at 1. But, as this Court rightly observed, "the government may choose whether to seek to enforce such waivers." ECF 120 at 14 (citing *United States v. Little*, 78 F.4th 453, 461 n.8 (D.C. Cir. 2023) (noting that "[b]ecause the Government 'opted not to enforce' [the defendant's] waiver, we need not decide whether [the defendant] reserved the right to bring this appeal"); *Ortega-Hernandez*, 804 F.3d at 451 ("[W]e need not enforce an appeal waiver when the government has not asked us to do so"); *United States v. Story*, 439 F.3d 226, 231 (5th Cir. 2006) (holding that if the government does not object to the defendant's appeal based on his appeal waiver, the waiver is no longer binding "because the government has waived the issue")); *see also United States v. Goodson*, 544 F.3d 529, 535 (3d Cir. 2008) ("the government may always choose not to invoke an appellate waiver").

And there are important distinctions justifying the different position the government took regarding Riley's release, including those identified by this Court in its recent order. ECF 120 at 15-16. Here, the government could have charged the defendants, who assaulted officers, with multiple other felony crimes, including 18 U.S.C. §§ 111(a) or (b), 231(a)(3), and 372. By contrast, to the government's knowledge, Riley did not assault officers or commit other felonies. Aside

from the violation of § 1512(c)(2), he was charged only with the four standard misdemeanors (18 U.S.C. §§ 1752(a)(1)-(2) and 40 U.S.C. § 5104(e)(2)(D)-(G)). This Court correctly recognized the distinction as "legally relevant" given its implications for the actual innocence showing, which must extend to forgone charges of equal or greater seriousness. ECF 120 at 15. Further material factual distinctions exist as well. Riley's 18-month sentence reflects the fact that his offense was far less serious than these defendants', each of whom received 48-month sentences. It is not improper for the government to consider the seriousness and violence of a defendant's conduct when making a discretionary decision to enforce a waiver.[4] That 18-month sentence is now less than three months from completion, a relevant factor in the analysis of "exceptional circumstances" at issue in a motion for release. *See Stottlemyer*, 2024 WL 1076852 at *5. Moreover, the decision to release a defendant pending adjudication of a § 2255 motion (as in *Riley*) involves a more defendant-favorable standard than in this posture, where defendants must show not just that a "substantial claim" exists as to some issue, but that they should actually prevail on that question. *See id.* at *3; *see also* Mem. Op., *United States v. Lyons,* No. 21-cr-79 (BAH), ECF 121. In short, the government's decision regarding release in a different case does not invalidate the waiver to which these defendants agreed.

Enforcing the waiver here is just. It was no surprise to any litigant, let alone the defendants, that legal questions surrounded § 1512(c)(2)'s application to January 6 defendants. Ochs and DeCarlo themselves had filed a motion to dismiss attacking the statute. Shortly before they engaged in plea negotiations, another judge in the district had issued a contrary interpretation of the statute; while they were negotiating their pleas, an appeal to the D.C. Circuit was filed. *See*

---

[4] In other settings, the law directs the government (and courts) to assess such factors. *See, e.g.,* 18 U.S.C. § 3553(a)(1) (sentencing factors, including nature and circumstances of the offense); 18 U.S.C. § 3142(g) (detention factors, including danger to the community).

*Miller*, 589 F. Supp. 3d 60; Transmission of Notice of Appeal, *Fischer,* 21-cr-234 (CJN), ECF 86 (D.D.C. June 22, 2022). With ample notice that this was a disputed issue, Ochs and DeCarlo chose to give their up their own rights to appeal the Court's decision, and, like Khadr, they received benefits in exchange. They were permitted to plead guilty to only one offense, and they received the certainty that they would not face future charges for the conduct described in the Statement of Offense. And, as described further below, the government could have brought multiple other felony charges here, particularly because Ochs and DeCarlo were captured on video throwing smoke bombs at the police together. The government also agreed that defendants would be entitled to a three-point acceptance of responsibility credit (with limited exceptions).

Ochs and DeCarlo's negotiated agreements stand "in stark contrast" to some other defendants who did not waive their appellate rights and instead participated in fully stipulated trials. ECF 120 at 9-10. Most of these defendants had to admit guilt on other charges in addition to the § 1512(c)(2) charge. Because Ochs and DeCarlo agreed to give up their appellate and collateral attack rights and agree to the greater certainty of a plea agreement, they were permitted to plead guilty to one offense only. *Cf.* Statement of Facts for Stipulated Trial, *United States v. Bender,* 21-cr-508 (BAH), ECF 93 at 19-20 (D.D.C. Dec. 7, 2022) (admitting guilt on six counts); *United States v. Southard-Rumsey,* 21-cr-387 (APM), ECF 64 at 21-24 (D.D.C. Jan. 27, 2023) (admitting guilt on nine counts, including three violations of 18 U.S.C. § 111(a)). Many other defendants proceeded to trial to preserve their challenge to § 1512(c)(2), as this Court observed. ECF 120 at 9 (citing cases). Had Ochs and DeCarlo wanted to preserve their rights to continue to litigate § 1512(c)(2), they could have proceeded without a plea agreement, sought to except the issue from their broad waiver of appellate and collateral rights, or negotiated a stipulated trial, as other January 6 defendants did. Instead, they chose to waive their rights to appeal and collaterally

attack their sentences to obtain an agreement that conferred benefits. In these circumstances, it is fair to enforce the parties' bargain, which includes an unambiguous waiver of their right to file a collateral attack.

### B. The Defendants' Motion is Procedurally Defaulted and They Do Not Demonstrate Actual Innocence as to Forgone Charges and the Offense of Conviction.

Even without the waiver, Ochs and DeCarlo's § 2255 motion would fail. It is procedurally defaulted because the defendants never sought direct review of their claims. Because Ochs and DeCarlo cannot establish cause for their default, they must demonstrate "actual innocence," but, for two independent reasons, they do not. First, they do not establish actual innocence of charges of equal or greater seriousness that the government forwent in connection with the plea. Second, they do not carry their burden to establish actual innocence—that it is more likely than not that *no* reasonable juror would convict them—of the charge under § 1512(c)(2).

### 1. The Defendants' Claim is Procedurally Defaulted

"The procedural default rule generally precludes consideration of an argument made on collateral review that was not made on direct appeal, unless the defendant shows cause and prejudice." *United States v. Hughes*, 514 F.3d 15, 17 (D.C. Cir. 2008); *United States v. Pettigrew*, 346 F.3d 1139, 1144 (D.C. Cir. 2003). To establish cause, a defendant must demonstrate "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim," such as government interference or that the factual or legal basis for the claim was not reasonably available. *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991) (internal quotation omitted). A defendant "bears the burden of showing both" cause and actual prejudice. *Hicks*, 911 F.3d at 627 (citation omitted).

"Inexplicably, [defendants'] opening brief does not acknowledge the existence of the procedural default rule." *Hughes,* 514 F.3d at 17. Under that rule, Ochs and DeCarlo cannot establish cause. A claim that is truly "novel"—where the law at the time did not provide counsel with a "reasonable basis" for the claim—can constitute "cause" to excuse a procedural default, *Bousley*, 523 U.S. at 622 (*quoting Reed v. Ross*, 468 U.S. 1, 16 (1984)). This Court has recognized that novelty exists in at least three circumstances:

> (1) the Supreme Court explicitly overrules its own precedent; (2) the Supreme Court changes course on a "longstanding and widespread practice to which [the Supreme Court had] not spoken, but which a near-unanimous body of lower court authority has expressly approved"; and (3) the Supreme Court disapproves of a once-sanctioned practice.

*United States v. Hammond,* 351 F. Supp. 3d 106, 123 (D.D.C. 2018) (citing *Reed,* 468 U.S. at 17, 104 S. Ct. 2901 (quoting *United States v. Johnson*, 457 U.S. 537, 551 (1982))). The fact that this Court had ruled against defendants' claim is not dispositive. "Futility cannot constitute cause if it means simply that a claim was 'unacceptable to that particular court at that particular time.'" *Bousley*, 523 U.S. at 623 (quoting *Engle v. Isaac*, 456 U.S. 107, 130 n.35 (1982)).

The defendants do not come close to establishing cause. Defendants identify no external factor preventing them from bringing this claim, which is not novel.[5] The application of § 1512(c)(2) was an open question in the D.C. Circuit (and the Supreme Court) at the time of defendants' plea and sentencing, one district judge had ruled in defendants' favor, and defendants across the district, including *these defendants*, had filed motions to dismiss challenging the

---

[5] An appeal waiver in a plea agreement does not constitute cause to overcome a procedural default. An appellate waiver is not a "factor external to the defense;" the defendants themselves agreed to it. *Carter v. United States*, No. 18-12723-B, 2018 WL 8667010, at *2 (11th Cir. Oct. 12, 2018) (appellate waiver does not constitute cause excusing procedural default); *United States v. Jones*, 56 F.3d 62 (4th Cir. 1995) (same). Allowing a defendant who agreed to waive his appellate rights to establish "cause" and simply file a § 2255 motion instead would "turn[] the 'cause requirement on its head.'" *United States v. Pipitone*, 67 F.3d 34, 39 (2d Cir. 1995).

statute's application to their case. *See Bousley,* 523 U.S. at 622 ("Indeed, at the time of petitioner's plea, the Federal Reporters were replete with cases involving challenges to the notion that 'use' is synonymous with mere 'possession.'" (citations omitted)); *cf. Hammond,* 351 F. Supp. 3d at 124 (finding cause for challenge based on Supreme Court decision which overruled two Supreme Court rulings, and which "no one—the government, the judge, or the appellant—could reasonably have anticipated.") (quoting *United States v. Redrick,* 841 F.3d 478, 480 (D.C. Cir. 2016)). The claim was reasonably available.

### 2.  The Defendants Do Not Establish Actual Innocence

Ochs and DeCarlo therefore cannot escape procedural default unless they make a threshold showing of "actual innocence". *Smith* v. *Murray*, 477 U.S. 527, 537 (1986). The "actual innocence" exception requires a defendant to show that it was "more likely than not that no reasonable juror would have convicted him" had the district court correctly instructed the jury and given the government the opportunity to adduce evidence of the omitted element. *Schlup* v. *Delo*, 513 U.S. 298, 327-328 (1995); *see also United States v. Baxter*, 761 F.3d 17, 31-32 (D.C. Cir. 2014) (defendant's bare-bones assertion not sufficient). "[T]enable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin*, *v. Perkins,* 569 U.S. 383, 386-87 (2013) (citing *Schlup*, 513 U.S. at 329, and *House v. Bell*, 547 U.S. 518, 538 (2006) (emphasizing that the *Schlup* standard is "demanding" and seldom met)).

In addition, "[i]n cases where the Government has forgone more serious charges in the course of plea bargaining, petitioner's showing of actual innocence must also extend to those charges." *Bousley,* 523 U.S. at 624. The same showing is required for forgone charges of *equal*

seriousness, and the charges need not have ever actually been brought. *United States v. Caso*, 723 F.3d 215, 219-21 (D.C. Cir. 2013) ("There is nothing strained about concluding that a prosecutor can forgo 'charges' either by dropping them after an indictment or by never bringing them at all.") (emphasis omitted). In the D.C. Circuit, courts measure the relative seriousness of a charge using the Sentencing Guidelines, not the statutory maximum. *Id.* at 225.

To rebut a claim of actual innocence, "the Government is not limited to the existing record." *Bousley,* 523 U.S. at 623–24 (also noting that court may consider "evidence [that] was not presented during petitioner's plea colloquy") (citation omitted); *see also Schlup*, 513 U.S. at 328 ("The habeas court must make its determination concerning the petitioner's innocence in light of all the evidence, including . . . evidence tenably claimed to have been wrongly excluded or to have become available only after the trial."). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley,* 523 U.S. at 623.

### a.  The Defendants Cannot Establish Actual Innocence of All Forgone Charges of Equal or Greater Seriousness

Ochs and DeCarlo, who claim they pled guilty merely because they were "physically present at the Capitol," ECF 112 at 5, minimize their conduct, and fail to establish their actual innocence of any other charges. Because two of those charges have an offense level equal or greater to the § 1512(c)(2) charge, Ochs and DeCarlo cannot prevail on their actual innocence claim, and their motion fails.[6] *See* ECF 89 ¶¶ 48-5, 91 ¶¶ 49-59 at (Final PSRs containing guidelines calculation, which the Court adopted).

---

[6] For the purposes of this brief, the government uses the offense level of 22 that the Court calculated for the § 1512(c)(2) offense at sentencing, notwithstanding the fact that the D.C. Circuit has since held that certain enhancements no longer apply. *United States v. Brock,* 94 F.4th 39, 51 (D.C. Cir. 2024), As explained below, however, the offense level for the 18 U.S.C. § 372 charge would be calculated using the same guidelines for the § 1512(c)(2) charge (so should be treated as equally serious regardless of whether the Court uses the pre- or post-*Brock* offense level).

Ochs and DeCarlo raise two overall objections to this analysis, neither of which is persuasive. They cite the Department of Justice's Principles of Federal Prosecution language providing that "prosecutors will generally seek a plea to the most serious offense that is consistent with the nature and full extent of the defendant's conduct . . ." ECF 118 at 5 (citing Department of Justice Principles of Federal Prosecution Section 9.27-400). They claim that these Principles mean that government could not have possibly forgone more serious charges here. *Id.* Were the defendants correct, the *Bousley* rule would lose most of its meaning, as courts would be required to presume that the government *always* offered a plea to the most serious charge and never forwent more serious charges. That is not the case. Calculations regarding litigation risks, benefits, and tradeoffs for even provable offenses can be complex. Here, several factors explain the government's decision here to seek a plea to § 1512(c)(2) at guidelines level 25 rather than require a plea to another charge outlined here. The charge under 18 U.S.C. § 372 is only equally as serious, not more serious (under the Guidelines), and has a lower statutory maximum; so nothing about the government's decision to forego that charge is inconsistent with even defendants' interpretation of the Principles. The charge under 18 U.S.C. § 111(b), meanwhile, has an offense level that is only one point higher under the guidelines; while being provable, carried some litigation risk; and was based on evidence that the government did fully develop until the case had already been pending for over a year, with a trial date set. In such a posture, given the relatively small difference in the guidelines (and equal statutory maximum), it is unremarkable that the government offered defendants the opportunity to plead guilty to one of the already pending charges before bringing this new charge.

Moreover, the Principles of Federal Prosecution only requires prosecutors to "generally" seek a plea meeting certain criteria. And here, obstruction of an official proceeding was the crime

that, at the time, was most "consistent with the nature and full extent of the defendant's conduct" (particularly because, at the time, it included enhancements for the scope of the interference with the government and defendants' violent conduct). As the Solicitor General stated during oral argument in *Fischer*, the charge of § 1512(c)(2) carried meaningful symbolism—the defendants did not merely assault police or disrupt a congressional hearing; rather, the "fundamental wrong committed by many of the defendants . . . was a deliberate attempt to stop the joint session of Congress from certifying the results of the election." Tr. of Oral Arg. at 36-37, *available at* https://www.supremecourt.gov/oral_arguments/argument_transcripts/2023/23-5572_0pm1.pdf; *see also id.* at 95-96 (other charges "do not require that Petitioner have acted corruptly to obstruct an official proceeding . . . one of . . . the root problems with Petitioner's conduct is that he knew about that proceeding . . . he was prepared to storm the Capitol . . . he went to the Capitol on January 6th with that intent in mind and took action . . . it is entirely appropriate for the government to seek to hold Petitioner accountable for that conduct with that intent."). The government thus had reason to seek a plea to §1512(c)(2), consistent with Principles of Federal Prosecution. *See* Principles of Federal Prosecution 9-27.230 (noting the needs to pursue cases with "substantial federal interest"). Moreover, as noted above, it was a plea to a crime with which the defendants had already been charged, completed motion practice, and had a trial date set; to bring other charges anew might have delayed the trial further.

Defendants also provide an incomplete description of *Caso*, suggesting that the D.C. Circuit called into question *Bousley*'s rule that a defendant must establish actual innocence of charges that were of equal or greater seriousness. ECF 118 at 4 n.2. *Caso* did not challenge that rule; rather, it recognized that the rule was not based simply on the idea that "the government would have demanded a plea to the more serious charge had it known the charge of conviction was

invalid." ECF 118 at 4 n.2 (quoting *Caso,* 723 F.2d at 222-23). In a passage from *Caso* that defendants ignore, the panel proceeded to identify another rationale underpinning *Bousley* of which it did approve: the "equities of plea bargaining." *Caso,* 723 F.3d at 223. Specifically, "if the uncharged offense is more serious than the offense of conviction, the lesser penalty for the latter should stand unless the defendant can show that he is innocent of both offenses." *Id.* The idea is that the defendant should not receive "an unjustified windfall." *Id.* (citation omitted). Wiping Ochs' and DeCarlo's slates clean when they committed multiple other serious offenses would provide such a windfall.

### i.   18 U.S.C. § 111(b)

As relevant here, 18 U.S.C. § 111(b) criminalizes using a deadly or dangerous weapon in the course of forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with a federal officer. The defendants admitted they threw smoke bombs at the police. ECF 79 ¶ 12; ECF 82 ¶ 13. That is an assault. They did this in the middle of an intense conflict between rioters and police on the Capitol's West Front, with rioters attacking police with chemical spray and metal rods, among other objects. ECF 94 at 15. In this context, the smoke bomb was a "deadly or dangerous weapon."

An object is a deadly or dangerous weapon if the object is capable of causing serious bodily injury or death to another person and the defendant used it in that manner. *United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002). While such injuries may not be common, smoke bombs are "capable" of causing acute lung injury (from smoke inhalation).[7] Their capability to

---

[7] *See, e.g.,* "A Case of Smoke Bomb-induced Acute Lung Injury," <u>Intern Med.</u> 2021 Mar 15; 60(6): 965–966; *available at* National Library of Medicine, National Center for Biotechnology Information, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8024971/; *see also* "Zinc chloride-induced TRPA1 activation does not contribute to toxicity in vitro," *Toxicology Letters,* 1 September 2018, *available at* https://www.sciencedirect.com/science/article/abs/pii/S0378427417313401?via%3Dihub ("A

cause serious bodily injury is even greater in the context of the manner used here, where defendants threw the bombs at officers who were outnumbered and being actively attacked by a crowd of thousands. The smoke could obscure officers' vision, leaving them unable to see and defend themselves against objects being thrown or sprayed, or even rioters charging the police line.

The guidelines calculation for the violation of 18 U.S.C. § 111(b) would result in a total offense level of 23 (after acceptance) – higher than the level 22 of the defendants' offense. The offense level of 23 would be calculated as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[8] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(7) | § 111(b) conviction | +2 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous weapon | +4 |
| U.S.S.G. § 3A1.2(a)-(b) | Official Victim | +6 |
| U.S.S.G § 3E.1.1 | Acceptance of Responsibility | -3 |
| **TOTAL** | | 23 |

---

plethora of clinical respiratory symptoms including laryngeal, tracheal, and bronchial mucosal edema and ulceration, interstitial fibrosis, alveolar obliteration, interstitial edema, and bronchiolitis obliterans have been associated with inhalation of $ZnCl_2$ smoke"); "Inhalation lung injury induced by smoke bombs in children: CT manifestations, dynamic evolution features and quantitative analysis," J Thorac Dis. 2018 Oct; 10(10): 5860–5869, *available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6236165/#:~:text=Smoke%20bombs%20can%20release%20a,cause%20airway%20and%20lung%20injury.* (noting studies finding various forms of lung injury and explaining that "Smoke bombs can release a mixed chemical smoke containing zinc chloride, zinc oxide, hexachloroethane and other chemical ingredients after flaring. Smoke inhaling can cause airway and lung injury."); "Pulmonary damage after modest exposure to zinc chloride smoke. *Respiratory Medicine.* 1999;93(12):885–890.

*available at* https://pubmed.ncbi.nlm.nih.gov/10653050/ ("sometimes even a modest exposure to zinc chloride smoke can cause significant late and long-term decline in lung functions despite mild initial symptoms. A case series of thirteen soldiers exposed to zinc chloride smoke during a combat exercise showed a statistically significant decline in their lung diffusion capacity and total lung capacity of 16.2% and 4.3%, respectively, four weeks following the exposure.)

"Pulmonary function test findings in patients with acute inhalation injury caused by smoke bombs," Journal of Thoracic Disease, Vol 8, No 11 (November 16, 2016) (noting danger of "lung injury and even death"); *available at* https://jtd.amegroups.org/article/view/10602/html#:~:text=Some%20studies%20have%20suggested%20that,damage%20of%20the%20respiratory%20system..

[8] By cross-reference from U.S.S.G. § 2A2.4(c)(1), which directs that U.S.S.G. § 2A2.2 be applied if the conduct constituted aggravated assault (as, here, when it involved a dangerous weapon and intent to commit another felony, such as a violation of 18 U.S.C. § 231(a)(3) (civil disorder)).

Defendants challenge the application of the dangerous-weapon and official-victim enhancements here. ECF 118 at 6. Their conduct easily justifies both. A dangerous weapon, as relevant here, is "(i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g., a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun)." U.S.S.G. § 1B1.1 n.1(E); U.S.S.G. § 2A2.2 n.1 (cross-referencing the meaning of "dangerous weapon" in U.S.S.G. § 1B1.1 n.1). Because the defendants violated 18 U.S.C. § 111(b) by using a "dangerous weapon"—a weapon capable of causing serious bodily injury—their conduct fulfills the "dangerous weapon" definition in the Guidelines as well. The official victim enhancement, to the government's knowledge, has applied in every January 6 assault-of-a-federal-officer case. The defendants threw smoke bombs at the line of uniformed police following a protracted battle between rioters and police. There can be no question they assaulted the police based on their official status, meeting the requirements of U.S.S.G. § 3A1.2(a)-(b). The violation of 18 U.S.C. § 111(b) forgone by the government is thus, by one point, an offense of equal or greater seriousness than violation of § 1512(c)(2), defeating defendants' actual innocence claim.

Defendants' contrary arguments are unavailing. They assert they threw "novelty" items, without any proof or explanation of how the capabilities of novelty items would be any different. They note that one of the bombs (the one thrown by DeCarlo) did not ignite—but they do not refute that the other one did (allowing for *Pinkerton* liability for both defendants), and the evidence in this case indicates that the defendants fully intended for both to ignite. Specifically, DeCarlo said, "Oh fuck, I just threw it without pulling the pin. God damn it"—indicating that he intended

to ignite the bomb.[9] ECF 79 ¶ 12; ECF 74 Ex. 13 at 0:28-0:31. He then told Ochs to "pull the pin and throw it," establishing aiding and abetting liability for the other bomb as well. DeCarlo also directly committed an assault regardless of whether his smoke bomb ignited—an assault is "an intentional *attempt or threat* to inflict injury upon someone else, when coupled with an apparent present ability to do so."  Jury Instructions, *United States v. Todd,* 22-cr-608 (BAH), ECF 208 at 9 (D.D.C. filed Feb. 7, 2024). And the relevant question for the enhanced Section 111(b) liability here is the weapon's capability to cause serious bodily injury, not whether it actually did cause such a result. DeCarlo intended the smoke bomb be used in that manner, so a rational jury could convict him of violating 18 U.S.C. § 111(b) directly—in addition to holding him liable for the smoke bomb Ochs threw.

### ii.   18 U.S.C. § 372

The government also could have charged the defendants with violating 18 U.S.C. § 372, a charge the government brought against other members of the Proud Boys at the time that plea negotiations in this case were ongoing. Third Superseding Indictment, *United States v. Nordean,* 21-cr-175 (TJK), ECF 380 (D.D.C. June 6, 2022). Ochs and DeCarlo were charged with conspiracy (under 18 U.S.C. § 371), and fittingly so—all their actions were coordinated with each other, from their travel planning and simultaneous fundraisers to their shared accommodation; and, on January 6, they moved in lockstep, and they both filmed a video after celebrating how they had "stopped the steal" and "did our job." When they threw the smoke bombs at the police, they did so together, and discussed how to properly deploy them. Before January 6, Ochs had contemplated using violence if the Supreme Court failed to intervene on President Trump's behalf, providing a

---

[9] In addition, even if it did not ignite, the idea that a smoke bomb—a blunt object thrown into a line of police officers in the middle of a riot—is not capable of causing serious bodily injury in context is dubious.

window into his intent and willingness to use threats and intimidation. Carrying out that intent, on January 6, during the riot, DeCarlo asked Ochs, "you think they are scared in there?" Ochs replied, "yeah, and I fucking love it!" ECF 97 at 20.

Their conduct violated 18 U.S.C. § 372 under at least two theories. The statute provides:

> If two or more persons . . conspire to [(1)] prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof, or [(2)] to induce by like means any officer of the United States to leave the place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties, each of such persons shall be fined under this title or imprisoned not more than six years, or both.

*Id*.

DeCarlo and Ochs violated each clause of 18 U.S.C. § 372 as to both members of the United States Congress and police officers defending the Capitol. *See United States v. Nordean,* 21-cr-175 (TJK), 2022 WL 17583799, at *11-*15 (D.D.C. Dec. 11, 2022) (denying motion to dismiss charge under 18 U.S.C. § 372 and finding that members of Congress and U.S. Capitol Police hold an "office, trust, or place of confidence under the United States").[10] As outlined above, Ochs and DeCarlo functioned as a unit on January 6. By working together to storm the Capitol, throw smoke bombs at the police, point rioters toward Speaker Pelosi's office, and deface a door with their chilling "Murder the Media" slogan—among other actions—all in service of an effort to stop the certification proceeding, they sought to "prevent, by force, intimidation or threat" both members of Congress and the police (the direct victims of their smoke-bomb assault) from

---

[10] A jury convicted all five defendants in the *Nordean* case (members of the Proud Boys) of violating 18 U.S.C. § 372 in connection with their conduct on January 6 under both theories (preventing a member of Congress or federal officer from discharging and duty and inducing a member of Congress or federal officer to leave the place where their duties were required to be performed). Verdict Form, *United States v. Nordean,* 21-cr-175 (TJK), ECF 804, at 3-4 (D.D.C. May 4, 2023).

discharging their duties of certifying the vote and defending the Capitol on January 6. Each of these were threatening, intimidating, or forcible, assaultive activities. They reflected the violence that Ochs—who had earlier declared himself "pro-violence"— anticipated when he told other members of the Proud Boys, "I'll still chimp out if I'm wrong about the Supreme Court tho…we just have to TIME IT RIGHT and DO IT SMART." ECF 94 at 4-5.

The defendants' conspiracy also sought to injure officers or induce them to stop defending the Capitol. 18 U.S.C. § 372 ("to induce by like means any officer of the United States to leave the place, where his duties as an officer are required to be performed"), as manifested most clearly by their smoke-bomb assault. And they sought to induce members of Congress to leave the place where *their* duties were to be performed: they intended to stop Congress from certifying the election at the Capitol that day. Ochs summed it up as they left the Capitol: "we stormed the fuckin' U.S. Capitol and made Congress flee." ECF 94 at 31. DeCarlo flashed a thumbs-up sign. *Id.*

The guidelines for 18 U.S.C. § 372 are calculated identically to the guidelines for § 1512(c)(2) here. Because the conspiracy targeted members of Congress and the police in order to obstruct the certification, it uses the obstruction guideline, U.S.S.G. § 2J1.2.[11] *See United States*

---

[11] Under U.S.S.G. § 2X1.1, cmt. n.3, for a conspiracy conviction for which the substantive offense is not covered by a specific guideline, use § 2X5.1. Under § 2X5.1, since there is no applicable Chapter Two Guideline for an offense of preventing officers of the United States from discharging their duties in the Statutory Appendix, use "the most analogous guideline." The "officers" of the United States who were the victims of this count were the Members of Congress and law enforcement officers. Because the object of the defendants' conspiracy—preventing Members of Congress from performing their constitutional duties at the Capitol on January 6—was designed to obstruct the administration of justice, the most analogous guideline is U.S.S.G. § 2J1.2, "Obstruction of Justice." The victims of this effort—Members of Congress and the federal law enforcement who were protecting them—are indistinguishable for this purpose. Indeed, Judge Mehta applied §2J1.2 to violations of 18 U.S.C. § 372 by members of the Oath Keepers. *See United States v. Rhodes, et al.*, No. 22-cr-15 (APM). And the First Circuit agreed that §2J1.2, rather than §2A2.4, was the most analogous guideline for a defendant convicted of violating 18 U.S.C. § 372, when the defendant's conviction was premised on the defendant conspiring to prevent federal officers from arresting other people, and thus "obstructed the administration of justice." *United States v. Gerhard*, 615 F.3d 7, 33 (1st Cir. 2010); *see also United States v. Rakes*, 510 F.3d 1280,

*v. Biggs,* 21-cr-175-2 (TJK), Aug. 31, 2023 Sent. Hrg. Tr. ("Biggs Sent. Tr.") at 13-15 (applying

§ 2J1.2 to violation of 18 U.S.C. § 372 where defendants, like Ochs and DeCarlo, sought to induce

Congress to leave their place of duty during the certification) (transcript separately provided via

email on August 7, 2024); *see also, e.g., United States v. Meggs,* 22-cr-15-2 (APM), May 25, 2023

Sent. Hrg. Tr. at 32 (same).[12] Thus, 18 U.S.C. § 372 also qualifies as an equally serious offense

under the guidelines, and Ochs and DeCarlo have not established that no reasonable juror would

find them guilty of violating the statute.[13]

In summary, there are at least two charges of equal or greater seriousness that the

government forwent in connection with the plea. Ochs and DeCarlo establish their actual

innocence as to none of them. Their motion is barred.[14]

### b. The Defendants Do Not Establish Their Actual Innocence Under § 1512(c)(2)

The Court need not go further; the fact that Ochs and DeCarlo have failed to show that no

reasonable juror would convict them of violating 18 U.S.C. §§ 111(b) or 372 is enough to bar their

motion. They also do not carry their burden to establish, on the full factual record, that not a single

---

1290 (10th Cir. 2007) (acknowledging that a § 372 conviction for conspiring to impede and thwart the prosecution of other people would constitute "imped[ing] the due administration of the law," and thus would warrant application of §2J1.2 rather than §2A2.4).

[12] The transcript refers to Count Four, which was the conviction under 18 U.S.C. § 372. *See* Verdict Form, *United States v. Rhodes,* ECF 410 at 4-5.

[13] The government previously argued that Count Three of the Superseding Indictment, alleging a violation of 18 U.S.C. § 1361, was an offense of equal or greater seriousness because its offense level could be calculated under 3A1.4. The government withdraws the argument because the damage done by Ochs and DeCarlo's "Murder the Media" graffiti was under $1,000, making their violation of 18 U.S.C. § 1361 a misdemeanor offense to which the enhancement under 3A1.4 likely would not apply.

[14] The government also forwent charges under 18 U.S.C. § 111(a)(1) (felony assault) and 18 U.S.C. § 231(a)(3) (civil disorder). The fact that Ochs and DeCarlo faced all these additional felonies also underscores that they received a benefit from their plea bargain, and that that bargain should be enforced.

reasonable juror (making reasonable inferences from the evidence) would convict them of violating § 1512(c)(2).

The defendants' showing is insufficient. Their opening brief limits their analysis to the statement of offense (and even then, omits many facts). There is no dispute that the Court did not ask Ochs and DeCarlo to address *Fischer*'s new "records, documents, objects, or other things" requirement at their plea colloquy. But that only goes so far. Just because a court does not apprise a defendant of a certain legal requirement does not mean that facts supporting the omitted requirement do not exist.  "Mere legal insufficiency" is not "factual innocence," which *Bousley*, 523 U.S. at 623, requires they establish.

Here, the January 6 "official proceeding plainly used certain records, documents, or objects"—including, among others, those relating to the electoral votes themselves. *Fischer*, 144 S. Ct. at 2194 (Jackson, J., concurring). It "operate[d] through a deliberate and legally prescribed assessment of ballots, lists, certificates, and, potentially, written objections"; "Congress had before it boxes carried into the House chamber at the beginning of the Joint Session that contained 'certificates of votes from the electors of all 50 states plus the District of Columbia,'" U.S. Br. at 60, *United States v. Fischer et. al*, No. 22-3038 (D.C. Cir.) (filed Aug. 8, 2022); and (2) "as rioters began to breach the restricted area around the Capitol building and grounds on January 6, 2021, legislators were evacuated from the House and Senate chambers, and the staff for the Secretary of the Senate 'took the ballot boxes and other paraphernalia of the proceeding" out of the chamber "to maintain custody of the ballots and make sure nothing happen[ed] to them." *Id.* (citing trial transcript). By causing or attempting to cause the electoral ballots to be removed from the Chamber to ensure their safety, Ochs and DeCarlo impaired (or attempted to impair) the availability of those electoral certificates for use in the certification proceeding set to take place on January 6.

The concurring opinion in *Fischer* emphasized that § 1512(c)(2) remains available to prosecute January 6 riot participants. It recognized that "that official proceeding plainly used certain records, documents, or objects—including, among others, those relating to the electoral votes themselves." *Fischer*, 144 S. Ct. at 2194 (Jackson, J., concurring).  And it noted that "[i]t might well be that Fischer's conduct, as alleged here, involved the impairment (or the attempted impairment) of the availability or integrity of things used during the January 6 proceeding. . . If so, then Fischer's prosecution under § 1512(c)(2) can, and should, proceed." *Id.*

Ochs and DeCarlo fail to carry their burden to show that their conduct falls clearly outside this standard such that no reasonable juror would vote to convict. Ochs and DeCarlo are two politically aware individuals (who followed the election, knew about the certification, hosted political shows on social media, and who explicitly acknowledged that they caused the proceeding to stop by storming the building), who sought to stop the certification, engaged in conduct whose natural, probable, and actual consequence was to impair the availability of records, documents, objects, or other things—namely, the electoral certificates for President-Elect Biden that they did not want Congress to validate that day. They do not show that no reasonable juror could find that the natural, probable, and actual consequence of attacking officers and storming the Capitol was to make the electoral ballots unavailable to lawmakers, impairing their availability for use in the proceeding.  They do not show that no reasonable juror could find that these two politically savvy individuals, who also showed themselves willing to resort to illegal conduct to bring about their desired result, intended that natural and probable consequence. Or, alternatively, they do not show that no reasonable juror could infer that Ochs and DeCarlo *attempted* to impair the electoral votes' availability or integrity for use. Entering the Capitol, the defendants called out for "Nancy" and pointed other rioters toward Speaker Pelosi's office. They defaced the Capitol and stole. They do

not show that no reasonable juror could find that they would have taken an action to impede the ballots' availability or integrity for use, had they gotten that far—thus violating 18 U.S.C. § 1512(c)(2) under an attempt theory.

Defendants' challenges to the government's analysis are unavailing. Defendants criticize the government for not identifying a statement from the defendants that "directly relates to documents used in the vote certification." ECF 118 at 3. But intent need not—and often cannot— be proved directly; it would be the rare wire fraud defendant who wrote, "I intend to defraud my victims." There is nothing untoward about asking a jury to infer a defendant's intent from his or her statements and actions. The standard jury instruction that individuals intend the "natural and probable consequences" of their actions reflects that fact.

Here, defendants do not show that *no* rational juror could make such an inference. Defendants saw themselves as political journalists. They hosted online television shows and participated in encrypted chats discussing politics. Ochs—who had run for political office, recalled the Supreme Court decision in *Bush v. Gore*, speculated about how Justice Alito and Chief Justice Roberts would vote, and expressed awareness of state legislatures' role in choosing the president. DeCarlo's copious political commentary—as of January 6, he claimed to have worked for Murder the Media for four years—reflects a similar level of political engagement. *See generally* ECF 93 at 22-27 (describing DeCarlo interview on YouTube, "Talking to Our Frens in DC"); Molly Hennesy-Fiske, *"Some who stormed the Capitol insist, 'What I did was journalism,"* · *https://www.latimes.com/world-nation/story/2021-01-13/some-who-stormed-the-capitol-insist-what-i-did-was-journalism, Jan. 13, 2021*; ECF 101-1 Ex. 2 ("Murder the Media/Thunderdome" interview of DeCarlo).

And this was not just general political awareness. The defendants specifically chose to come to Washington, D.C. for the events of January 6—the day the certification was to take place, with Ochs making the long trip from Hawaii. They went to the trouble to fundraise to finance their trip. And their chatter repeatedly focused on the election, such as Ochs' speculation about how the Supreme Court might intervene, his participation in organizing a conference call in response to President Trump's tweet calling his supporters to D.C. for January 6, and both defendants' discussions of when Vice President Pence would "fail." ECF 97 at 11. The defendants were focused on the election, they admitted that they wanted to stop the certification that day, and they celebrated when they thought they achieved that precise goal. They were not obliviously present at the Capitol, but had a sophisticated level of knowledge about the political process at work.

To ask a jury to infer that these defendants, knowledgeable about the certification and intending to stop it, also knew the most basic facts about the certification—*i.e.*, that it involved the certification of electoral votes or ballots—and understood that their actions would make those ballots unavailable—is reasonable.  To ask a juror to infer that these defendants, well aware of the process and of the consequences of their actions, and euphoric about the results of their actions (making the ballots unavailable to Congress) intended that result—is reasonable. Such an argument does not base the defendants' guilt on "mere presence" at the Capitol (ECF 118 at 3), but on these defendants' specific level of understanding, knowledge about the proceeding, admitted intent that day, and the actions they took at the Capitol. The same argument likely might not be available to the government had defendants not podcasted, not chatted, not fundraised, not scrawled "Murder the Media" on the Memorial Door. But they did. *Fischer* does not affect every January 6 case in every posture identically.

The Court must ensure that "federal constitutional errors do not result in the incarceration of innocent persons." *United States v. Baxter*, 761 F.3d 17, 27–28 (D.C. Cir. 2014) (citation omitted). Ochs and DeCarlo, who worked together on January 6 to intimidate Congress and attack the police, all in service of their goal to stop the certification of the electoral ballots—fail to show they belong in this category.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny the defendants' motion to vacate their convictions under 28 U.S.C. § 2255.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

BY:     */s/ Alexis J. Loeb*
Alexis J. Loeb
Assistant United States Attorney
(Detailed)
CA Bar No. 269895
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
415-436-7200
Alexis.loeb@usdoj.gov